Michael M.K. Sebree #142649
William E. Adams #153330
Dawn Newton #209002
FITZGERALD ABBOTT & BEARDSLEY LLP
1221 Broadway, 21st Floor
Oakland, California 94612
Telephone: (510) 451-3300
Facsimile: (510) 451-1527
Emails: wadams@fablaw.com;dnewton@fablaw.com

Attorneys for Plaintiff
HUBB SYSTEMS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO

| | |
|---|---|
| HUBB SYSTEMS, LLC, | Case No.: C07-02677 BZ |
| Plaintiff, | |
| vs. | **NON-CALIFORNIA AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| MICRODATA GIS, INC., | |
| Defendant. | Date: August 1, 2007<br>Time: 10:00 a.m.<br>Courtroom G<br>Magistrate Judge Bernard Zimmerman |

7/6/07 (24601) #275026.1

1

## TABLE OF CONTENTS

2

3   Exhibit A:     Best Western Int'l. v. Mahroom
                   No. CV-07-827, 2007 U.S. Dist. WL 1302749 (D. Ariz. May 3, 2007)
4
    Exhibit B:     CGI Solutions, LLC v. SailTime
5                  No. 05-CV-4120, 2005 U.S. Dist. WL 3097533 (S.D.N.Y. Nov. 17, 2005)

6   Exhibit C:     Holder Corp. v. The Main Street Distributing, Inc.
                   No. 86-1285, 1987 U.S. Dist. WL 14339, at *2 (D. Ariz. January 21, 1987)
7
    Exhibit D:     Idaho Potato Commission v. Washington Potato Commission
8                  410 F.Supp.171, 176 (D.C. Idaho 1976)

9   Exhibit E:     Koch Engineering Co., Inc.v. Monsanto Co.
                   621 F. Supp. 1204 (E.D. Mo. 1985)
10
    Exhibit F:     Texas Instruments, Inc. v. Micron Semiconductor, Inc.
11                 815 F.Supp. 994 (E.D.Tex. 1993)

12  Exhibit G:     Utica Mutual Insurance Co. v. Computer Sciences Corp., Not Reported in
                   F.Supp.2d, 2004 WL 180252 (N.D.N.Y.)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7/6/07 (24601) #275026.1

**EXHIBIT A**

Westlaw.

Slip Copy                                                                Page 1

Slip Copy, 2007 WL 1302749 (D.Ariz.)

(Cite as: Slip Copy)

**Best Western Intern., Inc. v. Mahroom**
D.Ariz.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Arizona.
**BEST WESTERN INTERNATIONAL, INC.,**
Plaintiff,
v.
Adiba **MAHROOM**; Majid **Mahroom**; Linda
**Mahroom**; Laila **Mahroom**; Roxanne **Mahroom**;
Dianne **Mahroom**, Defendants.
**No. CV 07-827-PHX-JAT.**

May 3, 2007.

Cynthia Ann Ricketts, DLA Piper U.S. LLP,
Phoenix, AZ, for Plaintiff.

**ORDER**

JAMES A. TEILBORG, United States District Judge.
*1 Plaintiff has moved this Court for a Temporary
Restraining Order (" TRO" ) seeking to have this
Court require Defendants, who formerly properly
operated a Best Western motel, to remove all Best
Western marks from Defendants' property.
Defendants oppose the request for TRO on several
grounds including the California Franchise Relations
Act and the *Younger* abstention doctrine. On May 2,
2007, this Court held a hearing on the motion for
TRO. Prior to the hearing this Court required the
parties to come to the hearing prepared to discuss the
first-to-file rule.

**California Litigation**

On April 4, 2007, Defendants sued Plaintiff in
California state court. On April 26, 2007, Defendants
served Plaintiff in the California state court case. On
April 30, 2007, Plaintiff removed the California state
court case to Federal Court (the Federal District
Court for the Northern District of California).

**Arizona Litigation**

On April 19, 2007, Plaintiff filed this case. On April
26, 2007, Plaintiff filed the pending motion for TRO.
Defendants are specially appearing to oppose the
TRO. Plaintiff admitted at oral argument that
Defendants have not been served.

**First-To-File Rule**

' There is a generally recognized doctrine of federal
comity which permits a district court to decline
jurisdiction over an action when a complaint
involving the same parties and issues has already
been filed in another district.' *Pacesetter Systems,
Inc. v. Medtronic, Inc.,* 678 F.2d 93, 94-5 (9th
Cir.1982). This doctrine, known as the first-to-file
rule, ' gives priority, for purposes of choosing among
possible venues when parallel litigation has been
instituted in separate courts, to the party who first
establishes jurisdiction.' *Northwest Airlines, Inc. v.
American Airlines, Inc.,* 989 F.2d 1002, 1006 (8th
Cir.1993). The rule ' serves the purpose of promoting
efficiency well and should not be disregarded
lightly.' *Church of Scientology of California v.
United States Dep't of Army,* 611 F.2d 738, 750 (9th
Cir.1979)....
In applying the first-to-file rule, a court looks to three
threshold factors: ' (1) the chronology of the two
actions; (2) the similarity of the parties, and (3) the
similarity of the issues.' *Z-Line Designs, Inc. v.
Bell'O Int'l LLC,* 218 F.R.D. 663, 665
(N.D.Cal.2003). If the first-to-file rule does apply to
a suit, the court in which the second suit was filed
may transfer, stay or dismiss the proceeding in order
to allow the court in which the first suit was filed to
decide whether to try the case. *Alltrade, Inc. v.
Uniweld Products, Inc.,* 946 F.2d 622, 622 (9th
Cir.1991). ' Circumstances under which an exception
to the first-to-file rule typically will be made include
bad faith, anticipatory suit and forum shopping.' *Id.*
at 628 (internal citations omitted).
[Another] exception to the first-to-file rule is when '
the balance of convenience weighs in favor of the
later-filed action.' *Ward v. Follett Corp.,* 158 F.R.D.
645, 648 (N.D.Cal.1994). This is analogous to the '
convenience of parties and witnesses' under a transfer
of venue motion, 28 U.S.C. § 1404(a). *Med-Tec
Iowa, Inc. v. Nomos Corp.,* 76 F.Supp.2d 962, 970
(N.D.Iowa 1999); *800-Flowers, Inc. v.
Intercontinental Florist, Inc.,* 860 F.Supp. 128, 133
(S.D.N.Y.1994). The court with the first-filed action
should normally weigh the balance of convenience.
*Alltrade Inc.,* 946 F.2d at 628.

*2 *Intuitive Surgical Inc., v. California Institute of
Technology,* 2007 WL 1150787, *2 (N.D. Cal. April
18, 2007).

Slip Copy, 2007 WL 1302749 (D.Ariz.)

(Cite as: Slip Copy)

In this case, the California litigation was first filed. Thus, this Court must determine whether, as the court with the second filed suit, it should defer to the California court under the first-to-file rule. With respect to chronology, this Court finds that the California litigation was filed 15 days before this case and is the first-filed litigation. Further, because Defendants have not yet been served in this action, the California case is internally proceeding ahead of this case.

Next the Court must consider whether there is a similarity among the parties. As discussed at oral argument, the parties to the Arizona litigation include Adiba and Majid **Mahroom**, who are the original owners of the motel in question, their four children, and **Best Western**. The parties to the California litigation are only Mr. and Mrs. **Mahroom** and **Best Western**. Therefore, **Best Western** argues that the parties are not identical.[FN1] The sole reason for **Best Western** naming the children in the Arizona litigation is that **Best Western** has some evidence that the children have acquired some interest in the motel in question.[FN2] It is undisputed that the children are not parties to the contract between **Best Western** and Mr. and Mrs. **Mahroom**.[FN3]

> FN1. The parties dispute whether under Ninth Circuit law the lawsuits must be identical or only substantially similar. As quoted above in the legal standard, this Court agrees with Defendants that the litigations need only be substantially similar and not exactly identical. This result logically follows to prevent a litigant from unnecessarily adding a party or claim in a case involving the same transaction or occurrence solely to defeat the first-to-file rule.

> FN2. The Court is unclear how reliable this evidence is because Defendants assert that one of the children is deceased.

> FN3. **Best Western** argues that the children are nonetheless bound by the contract because at least one of the children corresponded with **Best Western** about the property. The Court finds this argument unpersuasive.

In the California case, Mr. and Mrs. **Mahroom** are seeking (among other things) a declaration of their rights under the **Best Western** contracts and whether Mr. and Mrs. **Mahroom** have the right to continue to use the **Best Western** marks for this property. By **Best Western's** own theory of why the children are proper parties to the Arizona litigation, specifically that they are somehow receiving the benefits of using the **Best Western** marks as owners of the property, then the children are also beneficiaries of the California litigation by having the right to use the mark on the property resolved. Thus, this Court finds that the addition of the children does not change the similarity of the parties between the Arizona and California litigations because, if the children are in fact partial owners of the property there will be benefits and burdens conferred on them exactly the same in both litigations. Conversely, if the children are not in fact partial owners of the party, they were not properly named as defendants in the Arizona litigation.[FN4]

> FN4. At oral argument counsel for **Best Western** conceded that in **Best Western's** contracts, an owner of a property cannot transfer ownership of the property without **Best Western's** consent. Further, **Best Western** conceded that only the parents signed the contracts as owners and that **Best Western** never consented to any transfer of ownership to the children. Therefore, if such transfer occurred, the Court is not yet convinced that **Best Western** is bound by the transfer.

The final prong the Court considers in determining whether the first-to-file rule applies is similarity of the issues. At oral argument, the counsel for **Best Western** conceded that all of the claims in this litigation could be brought as counterclaims in the California litigation. However, counsel argued that the **Mahrooms** should have to bring the claims they raise in the California litigation as defenses to this litigation. The Court finds this argument to basically be an admission that the claims are the same.[FN5]

> FN5. From oral argument on May 2, 2007:
> Court: " The other claims that you're asserting in this action, Lanham Act and so forth, could be asserted as counterclaims in the California action."
> Counsel for Best Western: " No, Your Honor. I-I guess they could be asserted, but I think that-I would look at it the reverse. I think that if the defendants here want to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assert that their membership agreement was terminated wrongfully, that could be a defense to this action...."

This argument highlights the policy behind the first-to-file rule. When two litigations involving the same parties and issues are proceeding simultaneously, to promote judicial efficiency and economy, one litigation must give way to the other litigation. Comity dictates that the second-filed court should defer to the first-filed court.

Specifically, in the California litigation, the Mahrooms argue that Best Western should be governed by the California Franchise Relations Act and that Best Western has breached certain provisions of that statute. In the Arizona litigation, Best Western claims venue lies in Arizona based on a forum selection clause in the contract; [FN6] defendants argue that Best Western is governed by the California Franchise Relations Act, which voids forum selection clauses. Therefore, the claim in the California litigation and the defense in the Arizona litigation are identical on this issue. Additionally, on the merits, in the California litigation the Mahrooms claim that Best Western did not properly terminate their relationship under both the contracts and the California Franchise Relations Act. In the Arizona litigation, the Mahrooms defend the request for TRO on the merits arguing that the contracts were not properly terminated and that they should be allowed to continue to use Best Western marks.

FN6. Notably, since it is undisputed that the children did not sign the contracts with a forum selection clause, it is unlikely that the forum selection clause would apply to the children. Therefore, although Best Western argues that it has claims against the children independent of the contracts, namely that as owners of the property they are wrongfully using Best Westerns marks, for Best Western to pursue the children on these theories, (it being undisputed that neither the children nor the contracts are in Arizona), it appears at this point in the record that venue and personal jurisdiction over the children would lie in California.

*3 The only specific distinction between the litigations noted by Best Western (and not addressed by Defendants) is that in the Arizona litigation Best

Western seeks to have the signs removed. However, in the California litigation the Mahrooms seek to continue to use Best Western marks for internet advertizing, they do not specifically seek to keep the signage. The Court does not find this distinction to be a different " issue" that would make the issues not similar for purposes of the first-to-file rule. Instead, this distinction is a different remedy, which necessarily flows from who prevails on whether the contracts were properly terminated and whether the Mahrooms can continue to use the marks. That issue is squarely brought, as either a claim or defense, in both litigations.

Therefore, the Court finds that all of the elements of the first-to-file rule are met in this case. As discussed above, there are circumstances in which a court can exercise discretion to decline to apply the first-to-file rule. Those include when the first filed action was filed in bad faith, was an anticipatory suit, or was filed as part of forum shopping. *Alltrade, Inc. v. Uniweld Products, Inc.,* 946 F.2d 622, 628 (9th Cir.1991). Best Western has not argued that any of these exceptions to the first-to-file rule apply in this case.

The other recognized exception to the first-to-file rule is the balance of convenience, which Best Western argues favors Arizona in this case. *See Ward v. Follett Corp.,* 158 F.R.D. 645, 648 (N.D.Cal.1994).[FN7] Normally, the court with the first-filed action should weigh the balance of convenience. *Alltrade Inc.,* 946 F.2d at 628; *see also Intuitive Surgical, Inc. v. California Institute of Technology,* 2007 WL 1150787, *3 (N.D. Cal. April 18, 2007) (second filed Court holding " As stated above, the court in the first-filed action should decide whether there is an exception to the first-to-file rule. Therefore, this Court will not address Intuitive's arguments that Caltech engaged in forum shopping, or that a balancing of convenience factors weighs in favor of litigating in Northern California. The Court defers to the Eastern District of Texas to decide the appropriate forum and whether an exception to the first-to-file rule is applicable." ); *Inherent.Com v. Martindale-Hubble,* 420 F.Supp.2d 1093, 1102 (N.D .Cal.2006) (second-filed court transferring case to jurisdiction where first-filed suit was pending); *Sony Computer Entertainment America, Inc., v. American Medical Response, Inc.,* 2007 WL 781969, *4 (N.D.Cal.2007) (first-filed court, after considering exceptions to the first-to-file rule and finding no exception, kept the case).

Slip Copy, 2007 WL 1302749 (D.Ariz.)
(Cite as: Slip Copy)

FN7. Courts outside the Ninth Circuit have found additional exceptions to the first-to-file rule. For example, in the Eastern District of Pennsylvania, the Court recognized the following exceptions to the first-to-file rule: " 1) bad faith, 2) a party anticipatorily filed to avoid a less favorable forum, 3) forum shopping motivated original filing; 4) second filed case had developed further than the original, or 5) extraordinary circumstances." *Hanover Fire & Casualty Insurance Company v. Sieron*, 2007 WL 1200058, *2 (E.D.Pa.2007).

In this case, this Court finds no reason to deviate from the normal rule, as articulated by the Ninth Circuit Court of Appeals and applied by the California district courts, that the first-filed court should consider the exceptions to the first-to-file rule. Therefore, this Court defers to the Northern District of California to decide the appropriate forum and whether an exception to the first-to-file rule is applicable. As a result, this Court will not proceed to consider the merits of the request for TRO because this Court is the second-filed court.

*4 Based on the foregoing,

**IT IS ORDERED** that Plaintiff's application for Temporary Restraining Order (Doc. # 7) is denied, without prejudice to Plaintiff either seeking such restraining order in the California litigation or removing this Court for a Temporary Restraining Order if the California Court declines jurisdiction and/or venue over the California action.[FN8]

FN8. At oral argument, there was some discussion of whether this Court might dismiss or stay this litigation based on the first-to-file rule. At this point, it does not appear on this record that defendants have been served, nor have they answered or otherwise responded to the complaint by seeking dismissal, stay or transfer. Therefore, at this point the only issue before the Court is the request for Temporary Restraining Order, which the Court has resolved. Plaintiff shall proceed with serving Defendants and Defendants may respond to the complaint in any way they deem appropriate.

D.Ariz.,2007.

Best Western Intern., Inc. v. Mahroom
Slip Copy, 2007 WL 1302749 (D.Ariz.)

END OF DOCUMENT

**EXHIBIT B**



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3097533 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

Page 1

▷
**CGI Solutions LLC v. Sailtime Licensing Group, LLC**
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
**CGI SOLUTIONS, LLC and Windpath Sailing, Inc., Plaintiffs,**
v.
**SAILTIME LICENSING GROUP, LLC, Defendant.**
**No. 05 Civ. 4120(DAB).**

Nov. 17, 2005.

*MEMORANDUM & ORDER*
BATTS, J.
**\*1** Plaintiffs **CGI** Solutions, LLC (" CGI" ) and WindPath Sailing, Inc. (" WindPath" ) have brought an action for a declaratory judgment pursuant to 28 U.S.C. § 2201. The judgment they seek would declare that Plaintiffs (1) did not misappropriate Defendant **SailTime** Licensing, LLC's (" SailTime" ) trade secrets; (2) did not infringe **SailTime's** copyrights; (3) did not engage in unfair competition; (4) did not convert any of **SailTime's** property; and (5) did not breach a contract with **SailTime.**

Now before the Court are several motions. **SailTime** moves pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure to dismiss the Complaint for improper venue, or alternatively, to transfer this action to the United States District Court for the Western District of Texas pursuant to 28 U.S.C. § 1404(a). Plaintiffs CGI and Windpath move to enjoin a counterpart action filed against them by SailTime in the Western District of Texas based on the first-filed rule. Plaintiff Windpath separately has moved to compel disclosure of Defendant's " Trade Secrets" and " Confidential Information" and has moved for a Preliminary Injunction.

For the reasons contained herein, Defendant's Motion to Dismiss for Improper Venue is DENIED; Defendant's Motion to Transfer is DENIED; Plaintiffs' Motion to Enjoin Proceedings in Texas is DENIED; and Plaintiff Windpath's Motion to Compel Defendant's Disclosure and for a Preliminary

Injunction is DENIED as moot.

However, for the reasons contained herein, the Court orders that this case be DISMISSED.

*I. BACKGROUND*

Plaintiff CGI is a limited liability company organized under Delaware law and authorized to do business in New York. (Compl.¶ 6.) It maintains its principal place of business in New York. Plaintiff WindPath is a corporation chartered under Connecticut law and authorized to do business in New York. (*Id.* ¶ 4.) Ian Treibick is the CEO of CGI, and later formed the corporation, Windpath. (*Id.* ¶¶ 10, 17.)

Defendant SailTime is a company organized under Texas law with its principal place of business in Austin, Texas. (*Id.* ¶ 8.) SailTime is a " fractional sailing" business established in 2001 and based out of Austin, Texas. (*Id.* ¶ 9.) The business functions like a timeshare, whereby several people share use of sailboats. (*Id.* ¶ 22.)

In the fall of 2004 Ian Treibick contacted SailTime from CGI's New York office to express interest in becoming a base owner in the northeast region of the United States. (Compl.¶ 13). On November 19, 2004, Treibick, allegedly on behalf of CGI, signed a Confidentiality and Nondisclosure Agreement (" Agreement" ) with SailTime. (Compl.¶ 14.) The Agreement required that the receiving party-here, CGI-keep confidential any information garnered from SailTime concerning its business practices, models, and technologies, as well as its customers.FN1 Moreover, a non-compete clause allegedly prohibited CGI from using any information disclosed by SailTime " to create or operate a time-share sailing business" if negotiations terminated. (Confidentiality and Non-Disclosure Agreement at 3.7, *in* O'Toole Dec., Ex. B.) The Agreement contained a forum-selection clause, which specified that the laws of the State of Texas and of the United States would govern the Agreement and that " all court proceedings relating to [the] Agreement must be brought in Austin, Texas." (*Id.* at 7.2.) Treibick executed the document in New York and returned it by fax to SailTime's Texas office. (Compl.¶¶ 14-15.)

FN1. Specifically, the Agreement stipulates

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2005 WL 3097533 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

that:
" [c]onfidential information" shall mean all information about SailTime Licensing Group's business, business plans, customers, strategies, employees, trade secrets, operations, records, finances, assets, products, manufacturing and production techniques, materials, technology, computer software and any concepts, implementation methodologies or designs relating to computer software, data and information that reveals the processes, methodologies, designs, technology or know how of a party's existing or future products, services, applications or methods of operation and other information identified by such party as proprietary or confidential, whether in writing, any other tangible form of expression or disclosed orally through virtual means."
Confidentiality and Non-Disclosure Agreement, at 3.1, *in* O'Toole Dec., Ex. B.

**\*2** Sometime during the subsequent weeks, **CGI** declined to enter into a licensing agreement with **SailTime**. (Compl.¶ 16.) Following the termination of licensing negotiations with **SailTime**, Treibick formed WindPath to operate a fractional sailing business in Connecticut. (Compl.¶ 17.) **SailTime** allegedly learned of the existence of WindPath through its website. (Compl.¶ 19.)

On April 5, 2005, an attorney for the law firm representing **SailTime** sent Treibick written notice demanding that he immediately " (1) take down the Windpath.com website, and any other website that incorporates **SailTime's** confidential information and trade secrets, [and] (2) cease any and all marketing and promotion activities that use any information disclosed to [him] by **SailTime**." (Letter to **CGI** and Ian Treibick from Brian J. O'Toole, dated April 5, 2005, at 2, *in* Pls.' Mot to Enjoin Tex. Proceeding, Ex. A.) The letter further demanded that Treibick provide to **SailTime** certain proprietary information within ten days from the date of the letter.[FN2] (*Id.*) The letter warned Plaintiffs that, if they did not cease and desist their alleged misconduct, **SailTime** would pursue " all civil remedies," which could include " fil[ing] a lawsuit seeking injunctive relief and civil damages for breach of contract, conversion, theft of trade secrets, copyright infringement, unfair competition, or other causes of action." (*Id*.)

FN2. That letter demanded of Plaintiffs the following information:
(a) The identity (name, address and phone number) of all persons or entities to whom you have forwarded emails or any other communications sent to you by SailTime;
(b) The identity of all other individuals involved in your business (i.e. the business described on the Windpath.com website), whether as an employee, contractor, investor, advisor, or otherwise;
(c) Complete copies of any advertising or publication you have authorized that promotes the business described on the Windpath.com website, including any advertised phone numbers;
(d) The identity of all prospects who have contacted you are any other individual involved in your business about opening a Windpath base or becoming a " Windpath base owner;"
(e) The identity of all press contacts with whom you have discussed the business described on the Windpath.com website;
(f) The identity of the person or entity hosting the Windpath.com website.
*Id.*

On April 26, 2005, **CGI** and WindPath filed a declaratory judgment suit against **SailTime** in this Court, seeking declarations that: (1) Plaintiffs did not misappropriate **SailTime's** trade secrets; (2) Plaintiffs did not infringe **SailTime's** copyrights; (3) Plaintiffs did not engage in unfair competition; (4) Plaintiffs did not convert any of **SailTime's** property; and (5) Plaintiffs did not breach a contract with **SailTime**. On May 3, 2005, **SailTime**, the Defendant named in this declaratory judgment action, filed suit against **CGI**, WindPath, and Ian Treibick in the United States District Court for the Western District of Texas, Austin Division. The Texas action and the action filed here are based on the same transaction and require a determination of mirror-image claims.[FN3]

FN3. In the Texas case, SailTime has requested relief under the following theories: (1) misappropriation of trade secrets and unjust enrichment; (2) breach of contract; (3) civil conspiracy; and (4) request for temporary and permanent injunctive relief. (*SailTime v.. Treibick,* No.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3097513 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

05-0319, Compl. at 6-7, *in* Memo. of Law in Support of Pls.' Mot. to Enjoin Tex. Proceeding, Ex. C.)

SailTime now moves to dismiss the declaratory judgment action pending in this Court for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, or alternatively, to transfer this action to the Western District of Texas pursuant to 28 U.S.C. § 1404(a). CGI and WindPath have moved this Court to enjoin SailTime's action in Texas based upon the first-filed rule. Finally, Plaintiff Windpath also has moved this Court to compel disclosure of the trade secrets and confidential information that SailTime alleges have been exploited, and for a preliminary injunction.

## II. *DISCUSSION*

### A. *Plaintiffs' Motion to Enjoin the Texas Proceeding*

Plaintiffs move this Court to enjoin the Texas proceeding, arguing that their declaratory judgment action was filed in New York first. The first-filed rule provides that " [w]here an action is brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action." *Meeropol v. Nizer,* 505 F.2d 232, 235 (2d Cir.1974). The rule " gives priority to the first-filed suit except where there are special circumstances which justify giving priority to the second-filed suit or a showing of a balance of circumstances favor[s] the second-filed suit." *J. Lyons & Co., Ltd. v. Republic of Tea, Inc.,* 892 F.Supp. 486, 490 (S.D.N.Y.1995). *See also Adam v. Jacobs,* 950 F.2d 89, 92 (2d Cir.1991); *Factors Etc. Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978), *cert. denied* 440 U.S. 908, 59 L.Ed.2d 455, 99 S.Ct. 1215 (1979) (special circumstances counseling against application of the first-filed rule exist when " inequitable conduct, bad faith, or forum shopping" motivated the commencement of the first-filed action), *overruled on other grounds by Pirone v. MacMillan, Inc.,* 894 F.2d 579 (2d Cir.1990). This Court finds not only that such special circumstances exist in the present case, but also that a balancing of other circumstances and conveniences in the litigation counsels against enjoining the second-filed action.

**\*3** Anticipatory filings constitute a special circumstance permitting departure from the first-filed rule. *Schnabel v. Ramsey Quantitative Systems,* 322 F.Supp.2d 505, 511-12 (S.D.N.Y.2004). Courts in this circuit have held that when a party sends a notice-of-suit letter to its opponent, and the opponent thereby files a declaratory judgment action, there is reason to find that the first-filed action is an anticipatory filing. *Factors Etc.,* 579 F.2d at 219 (letter stating defendant would be subject to litigation for injunctive relief, damages and an accounting if defendant did not stop selling infringing product provided defendant with notice of suit); *J. Lyons & Co.,* 892 F.Supp. at 490-91; *Federal Ins. Co. v. May Dep't Stores Co.,* 808 F.Supp. 347, 350 (S.D.N.Y.1992) (letter stating that lawsuit would be filed if claim was not satisfied by a specific date provided party with notice of suit). *See also Amerada Petroleum Corp. v. Marhsall,* 381 F.2d 661 (5th Cir.1967) (letter stating that plaintiff would bring suit against defendant in a jurisdiction where it was subject to service, without providing a specific deadline, gave sufficient notice of plaintiff's intent to file suit). *Cf. Employers Ins. Of Wausau v. Prudential Ins. Co.,* 763 F.Supp. 46, 49 (S.D.N.Y.1991) (letter asserting that party " hoped to avoid litigation" failed to sufficiently notify the opposing party of intent to litigate).

SailTime delivered a notice-of-suit letter to CGI and Treibick just before Plaintiffs filed their Complaint in this suit. In a letter dated April 5, 2005, SailTime's attorney demanded certain information from Plaintiffs so that SailTime could determine the extent of damages caused by Plaintiffs' alleged misconduct. " You should also know," SailTime's attorney wrote, " that SailTime views [CGI and Windpath's conduct] as an extremely serious matter, and will pursue all civil remedies available to it if necessary.... Sailtime may file a lawsuit seeking injunctive relief and civil damages for breach of contract, conversion, theft of trade secrets, copyright infringement, unfair competition or other causes of action ." (Letter to **CGI Solutions** and Ian Treibick from Brian J. O'Toole, dated April 5, 2005, at 2, *in* Pls.' Mot. to Enjoin Def.'s Tex. Action, Ex. A.)

These words indicated SailTime's resolve to bring suit against Plaintiffs. While SailTime's letter did not outright announce that it would be filing suit by a particular date, it bore greater resemblance to the notice-of-suit letter in *Factors Etc.* than to the letter in *Employers Insurance.* In *Factors Etc.,* the Second Circuit deemed sufficient a notice-of-suit letter that stated that the opposing party would be " subject to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 4
Not Reported in F.Supp.2d, 2005 WL 3097533 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

lawsuit for injunctive relief, damages and an accounting" unless they discontinued sales of the infringing product, *Factors Etc.*, 579 F.2d at 217, 219; whereas in *Employers Insurance*, the district court found that a letter asserting merely that the party " hoped to avoid litigation" did not warn the opposing party of the specter of litigation, *Employers Ins.*, 763 F.Supp. at 49.

**\*4** SailTime's April 5, 2005 letter to Plaintiff was not a tepid declaration of its ' hopes to avoid litigation' ; rather, **SailTime**, like the plaintiff in *Factors Etc.*, intimated its resolve to bring a lawsuit if CGI and Windpath did not cease and desist their alleged misconduct. **SailTime** also delineated very specific claims, including " injunctive relief and civil damages for breach of contract, conversion, theft of trade secrets, copyright infringement [and] unfair competition" . (O'Toole's April 5, 2005 Letter, at 2.) This Court holds that **SailTime's** April 5, 2005 letter sufficiently notified Plaintiffs of its resolve to sue.

Even were **SailTime's** letter intended to initiate a more amiable, non-litigious resolution with Plaintiffs, **SailTime** should not be barred from seeing to the end its second-filed action:
Where a party is prepared to pursue a lawsuit, but first desires to attempt settlement discussions, that party should not be deprived of the first-filed rule's benefit simply because its adversary used the resulting delay in filing to proceed with the mirror image of the anticipated suit. Otherwise, potential plaintiffs would be discouraged from first attempting to resolve their claims without resorting to litigation.

*Elbex Video, Ltd. v. Tecton, Ltd.*, 2000 WL 1708189 S.D.N.Y.2000) (quoting *Ontel Products, Inc. v. Project Strategies Corp .*, 899 F.Supp. 1144, 1150 (S.D.N.Y.1995)). Penalizing SailTime for not having filed suit within three weeks of its April 5, 2005 letter would contravene the judiciary's policy of encouraging settlement between adversaries.

Balancing the other circumstances in this litigation also advises against enjoining the Texas action. Nothing indicates that this declaratory judgment action could be decided sooner or more efficiently than the litigation in the pending Texas litigation. Moreover, Plaintiffs in the instant case lodged their grievances with this Court by way of a Complaint, rather than by proposing an Order to Show Cause or by requesting a Preliminary Injunction, either of which would have indicated to the Court that this

matter was one warranting urgent review. That Plaintiffs initiated this action with a mere complaint suggests that they filed first so that they could choose a forum for SailTime, not so that their legal rights could be adjudicated once and for all.[FN4]

> FN4. The Court's discussion of the Declaratory Judgment Act, *see* Part II.C, *infra*, also is of primary relevance in its decision to decline to enjoin the Texas proceeding.

Accordingly, Plaintiffs' Motion to Enjoin the Texas Proceeding is hereby DENIED.

### B. *Defendant's 12(b)(3) Motion to Dismiss for Improper Venue*

Rule 12(b)(3) of the Federal Rules of Civil Procedure allows for dismissal of a complaint for improper venue. An action is properly venued where, among other places, " a substantial part of the events or omissions giving rise to the claim occurred...." 28 U.S.C. 1391(a)(2).

Defendant's Motion to Dismiss this action for improper venue is without merit. Plaintiffs allege that " a substantial part of the events giving rise to the claim occurred and had a substantial impact in New York." (Compl.¶ 3.) Treibick allegedly researched his fractional sailing venture in part by conducting telephone conversations with individuals at SailTime from CGI's offices in New York City. (*Id.* ¶ 10-12.) The Complaint additionally asserts that CGI executed the Non-Disclosure Agreement in New York City. (*Id.* ¶ 15.) The combination of these allegations meets the requirements of 28 U.S.C. § 1391(a)(2), and therefore cannot justify dismissing the Complaint for improper venue. *See Polizzi v. Cowles Magazine*, 345 U.S. 663, 665-66 (1955) (permitting a district court to dismiss for improper venue if the chosen venue fails to satisfy the standard set forth by the relevant venue statute).

**\*5** SailTime alleges that the parties agreed to bring any dispute arising under the Non-Disclosure Agreement in Austin, Texas. This forum-selection clause, SailTime asserts, controls the parties' choice of venue. But even if this Court were to deem the forum-selection clause enforceable, such clauses do not receive consideration when determining whether to dismiss a case for improper venue. " The fact that parties contractually agreed to litigate disputes in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5

Not Reported in F.Supp.2d, 2005 WL 3097533 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

another forum is not a question of venue, but one of contract...." *Licensed Practical Nurses, Technicians and Health Care Workers of New York, Inc. v. Ulysses Cruises, Inc.*, 131 F.Supp.2d 393, 404-405 (S.D.N.Y.2000) (quoting *Nat'l Micrographics Sys., Inc. v. Canon U.S.A., Inc.*, 825 F.Supp. 671, 679 (D.N.J.1993)) (internal quotations omitted). Existence of a forum-selection clause does not authorize dismissal where venue otherwise is properly laid. *Licensed Practical Nurses*, 131 F.Supp.2d at 405-06.

Accordingly, Defendant's 12(b)(3) Motion to Dismiss for Improper Venue is hereby DENIED.

### C. *Defendant's Motion to Transfer under 28 U.S.C. § 1404(a)*

Defendant alternatively has moved to transfer this action to the Western District of Texas, Austin Division. According to 28 U.S.C. § 1404(a), " [f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any district or division where it might have been brought." This Court finds that transfer to the Western District of Texas would be improper.

Transferring venue of a case requires a district court to consider several factors:
(1) the place where the operative facts occurred; (2) the convenience of the parties; (3) the convenience of the witnesses; (4) the relative ease of access of proof; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the plaintiff's choice of forum; (7) the party's familiarity with the governing law; and (8) trial efficiency and the interests of justice.

*Schnabel v. Ramsey Quantitative Systems, Inc.*, 322 F.Supp.2d 505, 515 (S.D.N.Y.2004). Very little information is before this Court regarding these factors, especially information about witnesses and the conveniences of the parties. What information this Court does have indicates that New York is CGI's principal place of business, that Windpath is authorized to do business in New York, and that Defendant SailTime is a company organized in Texas. Neither these allegations nor anything else on the record provides the Court with a solid ground for transferring this case to the Western District of Texas.

What is more, the mirror-image of this declaratory

judgment action already has been filed in the Western District of Texas. To transfer this largely repetitive case to that district would duplicate that tribunal's work. Accordingly, Defendant's Motion to Transfer Venue is hereby DENIED.

### D. *Dismissal under the Declaratory Judgment Act, 28 U.S.C. § 2201(a)*

*6 Plaintiffs have brought their Complaint under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). Allowing this action to proceed here, however, would contravene the purposes of the Declaratory Judgment Act and would encourage forum-shopping.[FN5]

> FN5. While the parties did not specifically brief this legal issue, all the facts and documents necessary to make this decision of law already are before this Court.

The Declaratory Judgment Act provides that " [i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). This statute grants discretionary jurisdiction to courts to grant or deny relief rather than provide a litigant with an " absolute right" to an adjudication of claims. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287, 115 S.Ct. 2137, 2142, 132 L.Ed.2d 214 (1995) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). The Second Circuit has explained that a declaratory judgment may be rendered where it " will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir.1969), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970) (quoting E. Borchard, *Declaratory Judgments* 299 (2d ed.1941)).

*Broadview* stated that a declaratory judgment action should be entertained if either of the two objectives could be achieved, and that failure to do so was an error. 417 F.2d at 1001. However, recent district court cases in this circuit have held that a court's discretion is not " constricted or guided solely by these two criteria." *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F.Supp.2d 394, 433

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3097533 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

(S.D.N.Y.2002); *see also Great Am. Ins. Co. v. Houston Gen. Ins. Co.*, 735 F.Supp. 581, 585 (S.D.N.Y.1990); *accord Wilton*, 515 U.S. at 286-87 (" [S]ince its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion.... The statute's textual commitment to discretion and the breadth of leeway we have always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface." ).

" Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close." *Wilton*, 515 U.S. at 288 (1995). " In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* It would be " futile" for " a district court, knowing at the commencement of litigation that it will exercise its broad statutory discretion to decline declaratory relief, [to] nonetheless go through the futile exercise of hearing a case on the merits first." *Id.* at 287.

*7 Courts face competing equitable concerns where an adversary files a coercive suit in another venue shortly after the filing of a declaratory action that embraces the same claims. While a declaratory judgment may provide faster relief, " the federal declaratory judgment is not a prize to the winner of the race to the courthouses." *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 219 (2d Cir.1978), *cert denied*, 440 U.S. 908, 59 L.Ed.2d 455, 99 S.Ct. 1215 (1979) (*quoting Perez v. Ledesma*, 401 U.S. 82, 119 n. 12 (1971) (Brennan, J. dissenting)). " Even if the basic requirements for a declaratory judgment action are met, it is still within the discretion of the district court to decline to hear a declaratory judgment action, particularly when there is a pending proceeding in another court, state or federal, that will resolve the controversies between the parties." *Great American Ins. Co. v. Houston Gen.*, 735 F.Supp. 581, 584 (S.D.N.Y.1990).

Based on " the litigation situation as a whole," Plaintiffs' declaratory action should be dismissed. *Great American Ins. Co.*, 735 F.Supp. at 585 (dismissing declaratory judgment action where suit embracing the same claims was pending elsewhere).

True, Plaintiffs in this case filed their action before SailTime filed suit in Texas. But not more than a week passed between these two filings. Nothing about either action indicates that the declaratory judgment action before this Court could resolve the parties' legal relationship and rights any sooner than would the Texas action. *See Hartford Acc. & Indem. Co. v. Hop-On International Corp.*, 568 F.Supp. 1569, 1574 (S.D.N.Y.1983) (finding that where a pending action could be " resolved as completely, fairly, and quickly" as a declaratory judgment action, the latter properly may be dismissed).

Indeed, one of the Declaratory Judgment Act's chief purposes is to help the party who seeks the declaratory judgment to " avoid accrual of avoidable damages ... and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued." The present case warrants no such early adjudication. SailTime filed suit only a week after Plaintiffs filed their declaratory judgment action. For two cases embracing the same claims to proceed simultaneously through the federal court system would be a complete waste of judicial resources.

Moreover, CGI and Windpath made this Court aware of its grievances using a Complaint, rather than using a proposed Order to Show Cause, a Motion for a Preliminary Injunction, or some other pleading which might have suggested an urgency of the underlying matter. Plaintiffs' primary concern seems to have been the forum in which this matter would be litigated, not the duration or urgency of the litigation. Declaratory judgment actions are not meant to permit parties who fear the looming incubus of litigation to dodge a particular forum. *See Factors Etc.*, 579 F.2d at 219. Plaintiffs shall not be permitted to do so here.

*8 This Court also finds it telling that Treibick, on behalf of CGI, executed the Confidentiality and Non-Disclosure Agreement, thereby indicating Plaintiffs' consent to be bound by a Texas forum and by Texas law. The Court holds that Treibick's execution of that Agreement is yet another reason why this case should be dismissed from this Court.

In determining whether a contract not executed by both parties is meant to be binding, " [t]he court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3097533 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed in writing." ). *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir.1985). *See also Railroad Mgt Co., LLC v. CFS Louisiana Midstream Co.*, 2005 WL 2471037, at *6 (5th Cir.2005) (*citing Haws & Garrett Gen. Contractors, Inc v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex.1972) ( " An implied contract is formed where the mutual intent to be bound is inferred from the conduct of the parties under the circumstances." ).

Treibick's signature on the Agreement indicates Plaintiffs' intent to be bound by the Agreement. There is no indication that the parties expressly reserved the right not to be bound in the absence of the execution of a writing. Treibick formed Windpath-a fractional sailing enterprise-after discussing fractional sailing operations with SailTime. (Compl.¶¶ 14-17.) Nothing in the Agreement points to remaining terms not yet agreed upon, or to any dispute about any of the terms therein. (*See* Agreement, at 7.1 (" The Parties hereby agree that this Agreement shall constitute the entire agreement between the Parties regarding the subject matter of this Agreement." .) To the extent that Plaintiffs' declaratory judgment action and SailTime's Texas action depend on the Agreement, it is clear that Treibick consented to litigation in Texas. This is yet another reason for the Court to dismiss the case before it, and allow the Texas case embracing the same issues to proceed on the merits.

This Court finds that proceeding with the declaratory judgment action in this venue would work against the interests of justice, against the judicial policy of discouraging forum-shopping, and against the purposes of the Declaratory Judgment Act. It also would contravene what appears to have been Treibick's consent to resolve disputes under the Agreement in a Texas forum. Accordingly, Plaintiff's declaratory judgment action hereby is DISMISSED.

E. *Windpath's Motion to Compel and for Preliminary Injunction*

Plaintiff Windpath also has brought a Motion to Compel Disclosure of Defendant's " Trade Secrets" and " Confidential Information" , and has moved for a Preliminary Injunction. This Court will not consider Windpath's Motion on its merits, but rather understands that consideration of the Motion may be conducted best in the Western District of Texas,

Austin Division. There, Windpath's Motion, if re-filed, may be considered alongside the counterpart lawsuit already underway in that venue.

*9 Plaintiff Windpath's Motion to Compel Disclosure of Defendant's Trade Secrets and Confidential Information and for a Preliminary Injunction is DENIED by this Court as moot, but may be re-filed in the Western District of Texas for consideration there.

*CONCLUSION*

For the reasons stated above, this Court orders the following:

(1) Plaintiffs' Motion to Enjoin the Proceeding in the Western District of Texas is DENIED;

(2) Defendant's Motion to Dismiss for Improper Venue is DENIED;

(3) Defendant's alternative Motion to Transfer Venue to the Western District of Texas, Austin Division is DENIED;

(4) Plaintiff Windpath's Motion to Compel Disclosure of Defendant's " Trade Secrets" and " Confidential Information" and for a Preliminary Injunction is DENIED as moot.

This Court, however, orders that Plaintiff's declaratory judgment action be DISMISSED.

The Clerk of Court is hereby ordered to close this case.

SO ORDERED.

S.D.N.Y.,2005.
CGI Solutions LLC v. Sailtime Licensing Group, LLC
Not Reported in F.Supp.2d, 2005 WL 3097533 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT C**


Not Reported in F.Supp.                                                          Page 1

Not Reported in F.Supp., 1987 WL 14339 (D.Ariz.), 1987 Copr.L.Dec. P 26,120, 2 U.S.P.Q.2d 1507

**(Cite as: Not Reported in F.Supp.)**

# H
**Holder Corp. v. Main Street Distributing, Inc.**
D.Ariz., 1987.

United States District Court, D. Arizona.
**HOLDER** CORPORATION, et al., Plaintiffs,
v.
THE **MAIN STREET DISTRIBUTING, INC.**,
Defendant.
**No. CIV. 86-1285 PHX RCB.**

January 16, 1987.

Marvin A. Glazer, Cahill, Sutton & Thomas,
Phoenix, Ariz. for **Holder Corp.**,
SupraTechnologies, and Diversified Scale Co., Inc.
Burton L. Lilling, Lilling & Greenspan, White Plains,
N.Y., for The **Main Street Distributing, Inc.**

### ORDER
BROOMFIELD, District Judge.
**\*1** This matter is presently before the court on
defendant **Main Street's** motion to dismiss for
improper venue pursuant to Fed. R. Civ. P. 12(b)(3)
and alternative motion for change of venue pursuant
to 28 U.S.C. § 1404. **Main Street** argues that venue
is improper in Arizona for plaintiffs' (**Holder**)
trademark infringement and copyright infringement
claims. In their complaint, plaintiffs seek damages
and a permanent injunction against **Main Street** for
false designation of origin, trademark infringement,
unfair competition, and copyright infringement.

The product involved in this case is a pocket size
twin-beam gram scale with the registered trademark
of ' Calibron.' Plaintiff **Holder** corporation is a
Delaware corporation which does business in
Arizona as Supra Technologies. Supra Technologies
is the manufacturer of the ' Calibron.' Plaintiff
Diversified Scale Company, Inc. is an Arizona
Corporation with an exclusive license to **distribute**
the ' Calibron' scale. In late May of 1985, plaintiffs
began their initial sales of the ' Calibron' scales and
in early June of that year began their initial
**distribution** of the product. From June 14, 1985 to
March 26, 1986, **Main Street** purchased ' Calibron'
scales to sell to retailers and other distributors.
During this period, **Main Street** purchased
approximately 1,242 ' Calibron' scales.

After this period, **Main Street** began selling the '
Calibrator' scale. The ' Calibrator' is also a twin-
beam gram scale which it is alleged is identical to the
' Calibron' scale. In their complaint, plaintiffs allege
that **Main Street's** use of the term '·Calibrator' as
applied to gram scales and the related packaging of
such scales is so similar in sound and appearance to
**Holder's** trademark ' Calibron' that it is likely to
cause confusion, mistake, and deception to the public
as to the source and origin of **Main Street's** gram
scale.

Plaintiffs also allege that **Main Street** infringed their
copyright regarding the box design in which they
package the ' Calibron.' Plaintiffs first printed and
published the box design for the ' Calibron' on May
30, 1985; however, they omitted the copyright notice
for the box's design. They did not notice this
omission until nearly a year later on May 8, 1986.
Subsequently, they attached adhesive copyright
labels to all boxes lacking notice of the box's
copyright. In their complaint, plaintiffs allege that
**Main Street's** printed the ' Calibrator' scale boxes
with the same subject matter copied largely from
plaintiffs' copyrighted work. Due to **Main Street's**
alleged actions, plaintiffs seek to enjoin **Main Street**
from using the term ' Calibrator' and from
**distributing** the scale in its current box design. They
also seek damages.

### VENUE UNDER 28 U.S.C. § 1391(b)

**Main Street** claims venue is improper in Arizona
under 28 U.S.C. § 1391(b). 28 U.S.C. § 1391(b)
provides:
A civil action wherein jurisdiction is not founded
solely on diversity of citizenship may be brought
only in the judicial district where all defendants
reside, or in which the claim arose, except as
otherwise provided by law.

**\*2** Main Street points out that it does not reside in
Arizona so venue is improper under that portion of
1391(b). Furthermore, Main Street argues the alleged
trademark infringement claim did not arise in
Arizona and venue is therefore improper under that
portion of 1391(b).

Main Street's second argument raises the question of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 2

Not Reported in F.Supp., 1987 WL 14339 (D.Ariz.), 1987 Copr.L.Dec. P 26,120, 2 U.S.P.Q.2d 1507

(Cite as: Not Reported in F.Supp.)

where does a trademark infringement claim arise? In trademark infringement cases, the alleged wrong arises where the ' passing off' occurs, i.e., where the customer buys a product from one company in the mistaken belief the product was that of another company. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F. 2d 633, 639 (2d Cir. 1956), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), reh'g. denied, 352 U.S. 913, 77 S.Ct. 144, 1 L.Ed.2d 120 (1956). In applying this concept to this case, plaintiffs' claim arises in nearly half the judicial districts in the United States since both parties distribute their respective scales throughout the country. Such a result is contrary to Congress' intent behind 1391(b).

Congress added the ' claim arose' provision to 1391(b) to close the ' venue gap' which existed in multiple-party cases where federal subject matter jurisdiction existed, but there was no single federal district of proper venue because the defendants resided in different districts. Brunette Machine Works v. Kockum Industries, 406 U.S. 706, 710 n. 8, 92 S.Ct. 1936, 1939 n.8, 32 L.Ed.2d 428 (1972). The purpose of the venue statute is to protect the defendant against the risk a plaintiff will select an unfair or inconvenient place for the trial. Leroy v. Great Western United Corp., 443 US. 173, 183-84, 99 S.Ct. 2710, 2716-17, 61 L.Ed.2d 464 (1979). In Leroy, the Court construed the ' claim arose' provision of 1391(b): ·

[I]t is absolutely clear that Congress did not intend to provide for venue at the residence of the plaintiff or to give that party an unfettered choice among a host of different districts . . .. Rather, it restricted venue either to the residence of the defendants or to a ' place which may be more convenient to the litigants'- i.e., both of them-' or to the witnesses who are to testify in the case.' . . . In our view, therefore, the broadest interpretation of the language of § 1391(b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility-in terms of availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but not of the plaintiff)-may be assigned as the locus of the claim.

Id. at 185, 99 S.Ct. at 2717 (citations omitted).

Since plaintiffs' claim arose in more than one judicial district, this case is an unusual one according to

Leroy. The leading case regarding where the ' claim arose' under § 1391(b) for trademark infringement actions is Honda Associates, Inc. v. Nozawa Trading, Inc., 374 F. Supp. 886 (S.D. N.Y. 1974). Although the Leroy decision is the most recent enunciation of the ' claim arose' provision of 1391(b), many district court cases rely on Honda Associates as well as Leroy in determining venue in trademark infringement actions. See e.g., Sunray Enterprises, Inc. v. David C. Bouza and Associates, 606 F. Supp. 116, 117 (S.D. N.Y. 1984); Mercantile Financial Corp. v. UPA Productions, 551 F. Supp. 672, 675 (N.D. IL 1982); Accutest Corp. v. Accu Test Systems, Inc., 532 F. Supp. 416, 421-22 (D. MA. 1982). Like these other courts, this court must also rely on the Honda Associates case to determine where the claim arose in this case.

*3 In Honda Associates, the court applied the ' weight of contacts' test and held a trademark infringement claim does not arise in a district where the defendant has only minuscule contact. Id. at 892. In that case, a California defendant received only three orders from New York for the alleged infringing goods. The goods had a total retail value of $37.00 and the order represented only 1/300 of 1% of the defendant's sales of all goods during the alleged infringing period. Id. at 888. The court stated the right provided by 1391(b) to sue in any district ' in which the claim arose' is not the right to sue in a district where any part of the claim, however small, arose. Id. at 892.

Later cases from the Southern District of New York state Honda Associates stands for the proposition that venue is improper where no substantial part of the infringing action occurs within the confines of the judicial district at issue. Metropa Co. Ltd. v. Choi, 458 F. Supp. 1052, 1055 n. 14 and cases cited therein (S.D. N.Y. 1978). Although there is no direct Ninth Circuit authority on trademark infringement claims and venue under 1391(b)'s ' claim arose' provision, the substantial weight of contacts test developed by Honda Associates and its progeny is similar to the Ninth Circuit's venue test for 1391(b) in determining the district ' in which the claim arose.' In the Ninth Circuit, venue under 1391(b) is proper in any district in which a substantial part of the acts, events, or omissions occurred giving rise to the claim for relief. District No. 1, Pacific Coast District, MEBA v. State of Alaska, 682 F.2d 797, 799 (9th Cir. 1982); Sustain v. Shapiro and Lieberman, 678 F.2d 115, 117 (9th Cir. 1982); Commercial Lighting Products v. United

Not Reported in F.Supp.                                                                                          Page 3

Not Reported in F.Supp., 1987 WL 14339 (D.Ariz.), 1987 Copr.L.Dec. P 26,120, 2 U.S.P.Q.2d 1507

**(Cite as: Not Reported in F.Supp.)**

States District Court, 537 F.2d 1078, 1079 (9th Cir. 1976). The Ninth Circuit has not considered the effect of the Leroy Court's reading of 1391(b) on its substantial contacts test. District No. 1 at 799.

Under the above tests, the issue for the court to decide is whether a substantial part of **Main Street's** alleged infringing actions occurred in Arizona for venue to be proper here? Up to the time of the issuance of the preliminary injunction prohibiting **Main Street** from **distributing** the ' Calibrator' scale, **Main Street** sold 23,194 ' Calibrator' scales. Of this amount, **Main Street** sold 900 scales to one Arizona customer-Asco, Inc. of Scottsdale, Arizona. Asco operates a chain of retail stores called ' Happy Trails.' **Main Street** only shipped 600 scales to Arizona because it shipped the other 300 to Asco's stores in Colorado and Hawaii. Thus, **Main Street's** ' Calibrator' contacts with Arizona amount to 2.6% of its total sales of the product.

The burden is on **Main Street** to show venue is clearly proper elsewhere. Here **Main Street** argues venue is proper in the Northeastern part of the United States (i.e. New York, Pennsylvania, New Jersey, and Connecticut) because it shipped approximately 45% of its ' Calibrator' shipments there. **Main Street** fails to specify however, which judicial district in those states it shipped the ' Calibrator.' Under § 1391(b), a claim must arise in the judicial district for venue to be proper there, not in any part of the state where the judicial district is located.

*4 Because Main Street failed to specify which district it shipped the ' Calibrator' to, the court must divide the number of contacts it lists with any particular state by the number of judicial districts located in that state. [FN1] Consequently, there is a dilution of the contacts the ' Calibrator' has with any one district Main Street argues is proper. For example, when the court divides the 5,438 contacts the ' Calibrator' had with New York by the five judicial districts located within that State, each district amounts to no more than 5% of Main Street's sales. After accounting for the dilution factor among the states Main Street shipped the ' Calibrator' to, the court finds there are 13 judicial districts in which the scale's contacts range from 2.6% to 5%. There are 21 districts where the ' Calibrator's' contacts amount to less than 2.6%. As noted above, Main Street's ' Calibrator' contacts with Arizona is 2.6%. This amount is more than half of 5%. Consequently, there is no real judicial district where Main Street's '

Calibrator' contacts are more substantial than that of any other district.[FN2] Venue is therefore proper in Arizona.

' DOING BUSINESS' UNDER 28 U.S.C. § 1391(c)

Plaintiffs also argue venue is proper here because Main Street resides in Arizona for purposes 1391(b). Plaintiffs rely on 1391(c) to assert Main Street resides in Arizona. 1391(c) provides:
A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes.

Based on Main Street's business activities within the state, plaintiffs allege Main Street is ' doing business' in Arizona under 1391(c) and therefore resides in Arizona under 1391(b).

Plaintiffs argument raises the issue of what constitutes ' doing business' under 1391(c)? They argue the favored view is a corporate defendant is doing business in a district for venue purposes if it is amenable to service of process within that judicial district. See Du-Al Corp. v. Rudolph Beaver, Inc., 540 F.2d 1230, 1233 (4th Cir. 1976); Houston Fearless Corp. v. Teter, 318 F.2d 822, 825 (10th Cir. 1963). See also Wright, Law of Federal Courts, § 42 at 247 (4th ed. 1983); 1 Moore's Federal Practice ¶0.142[5.-1-3], at 1411 (1986); 15 Wright, Miller and Cooper, Federal Practice and Procedure, Jurisdiction § 3811 at 65-69 (1976). The apparent rationale for this view is if a corporate defendant's activities within a district make it fair (i.e., not offensive to traditional notions of fair play and substantial justice) to assert personal jurisdiction over a corporation in a state where the district is located, it is fair to require the corporation to defend a suit in that district. Houston Fearless Corp. at 1232-33.

While this view has scholarly support, it is not unanimously adhered to by the courts. Other cases hold more is required to be ' doing business' for venue purposes then is required for service of process. Johnson Creative Arts v. Wool Masters, 743 F.2d 947, 949 (1st Cir. 1984). See also Wright, supra, § 42 p. 247 n. 51; Moore, supra, at 1411; Wright, Miller and Cooper, supra, § 3811 at 65-69 n. 46 and cases cited therein. Those cases rejecting the above view do so because the fairness considerations underlying personal jurisdiction are not the same as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4

Not Reported in F.Supp., 1987 WL 14339 (D.Ariz.), 1987 Copr.L.Dec. P 26,120, 2 U.S.P.Q.2d 1507

(Cite as: Not Reported in F.Supp.)

those underlying venue. The personal jurisdiction test of minimum contacts is based on the minimum amount of fairness required to comport with due process. Under such an analysis a defendant may be haled into a distant court to allow a state to protect its interests and the interests of the plaintiffs so long as doing so is fair and does not deny the defendant due process of law. The convenience of the location is not determinative. In contrast, Congress added venue limitations to insure a defendant a fair location for trial and to protect him from the risk a plaintiff will select an unfair or inconvenient place for trial. Venue is a privilege Congress gave to defendants primarily as a matter of convenience. Johnson Creative Arts at 949-52, Honda Associates, Inc. at 889.

*5 After studying the case law adhering to either view, the court finds the latter view more persuasive and reasonable. In the court's mind, more is required to be ' doing business' under 1391(c) for venue purposes then is required for personal jurisdiction to exist over a corporate defendant. Thus, the fact a particular court's assertion of personal jurisdiction is fair so as to comport with due process concerns does not mean that to hold a trial there is fair in the sense contemplated by Congress in the venue statute. Venue and personal jurisdiction are independent of each other and the court must interpret them with their respective underlying objectives and rationales in mind. Johnson Creative Arts at 952, Time, Inc. v. Manning, 366 F.2d 690, 696 (5th Cir. 1966), Honda Associates, Inc. at 889.

In Johnson Creative Arts, the First Circuit developed a workable test to determine when a corporate defendant is ' doing business' for purposes of 1391(c). The First Circuit stated a corporation is ' doing business' under 1391(c) if the extent of the business it does in the state in which the district is located is such that the state would require the corporation to obtain a license or register. Johnson Creative Arts at 954. The Commerce Clause restricts the power of a state to require a foreign corporation to obtain a license to do business in that state. Allenberg Cotton Co., Inc. v. Pittman, 419 U.S. 20, 31-32, 95 S.Ct. 260, 266-67, 42 L.Ed.2d 195 (1974). A state cannot require a foreign corporation to qualify to do business in that state without some kind of intrastate activity or localization of business in that state. Id. at 33, 95 S.Ct. at 267. Here, the court finds no type of localization or intrastate activity by Main Street to require it to obtain a license from Arizona. Main Street maintains no office within the state nor

does it have any employees in the state. Furthermore, the shipping of 600 ' Calibrator' scales into the state does not constitute intrastate activity. Thus, the court finds that Main Street is not ' doing business' in Arizona as is required for venue to be proper under 1391(c).

COPYRIGHT VENUE UNDER 28 U.S.C. § 1400(a)

The final issue for the court to consider is whether venue for plaintiffs' copyright claim is proper in Arizona. 28 U.S.C. § 1400(a) provides:
Civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights may be instituted in the district in which the defendant or his agent resides or may be found.

There is no evidence that Main Street resides in Arizona. Therefore, the only way venue is proper in Arizona for plaintiffs' copyright claim is if Main Street may be found in Arizona. This court previously interpreted 1400(a) in Airola v. King, 505 F.Supp. 30 (D. AZ 1980). There, the court stated a defendant in a copyright action may be found for purposes of 1400(a) venue in any district where personal jurisdiction may be obtained under a state's long arm statute. Id. at 31. Thus, venue is proper in Arizona if this court may assert personal jurisdiction over Main Street.

*6 Arizona's long arm statute establishes personal jurisdiction over nonresident defendants to the maximum extent permitted by due process. Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1330 (9th Cir. 1984); Houghton v. Piper Aircraft Corp., 112 Ariz. 365, 367, 542 P.2d 24, 26 (1975). Due process requires that a defendant have certain minimum contacts with the forum so that maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed.2d 95 (1945). To satisfy this due process requirement, plaintiff must prove either ' general jurisdiction' or ' limited jurisdiction' exists. Gates at 1330. A sufficient relationship between the defendant and Arizona exists to support general jurisdiction if the plaintiff can demonstrate the defendant's activities within Arizona are ' substantial' or ' continuous and systematic' even if the claim is unrelated to those activities. Haisten v. Grass Valley Medical Reimbursement Fund, Ltd., 784 F.2d 1392, 1396 (9th Cir. 1986); Gates at 1330; Data Disc, Inc. v. Systems Technology Associates, Inc., 557 F.2d 1280, 1287

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1987 WL 14339 (D.Ariz.), 1987 Copr.L.Dec. P 26,120, 2 U.S.P.Q.2d 1507

**(Cite as: Not Reported in F.Supp.)**

(9th Cir. 1977).

Plaintiffs point out that a business relationship existed between **Main Street** and Asco, Inc. of Scottsdale since July 12, 1984. Since then, Asco purchased $34,406.38 worth of goods from **Main Street**. Asco placed all orders for these goods from its office in Scottsdale and **Main Street** shipped the goods C.O.D. Based upon this activity, plaintiffs argue that **Main Street's** activities within Arizona are ' substantial' or ' continuous and systematic' enough for the conferral of general jurisdiction over **Main Street**.

The court must focus on the the economic reality of the defendant's activities in examining whether general jurisdiction exists. Gates at 1331. **Main Street** points out that its total sales for 1986 in Arizona amounted to only 0.35% of its nationwide total. In the court's mind, the economic reality of **Main Street's** activities do not constitute ' substantial' or ' continuous and systematic' activities for the conferral of general jurisdiction.

If the defendant's activities are not so pervasive to subject him to general jurisdiction, then a court may still assert jurisdiction for a cause of action arising from a defendant's forum related activities. Haisten at 1397. The Ninth Circuit utilizes a three prong test to determine whether a court may exercise limited jurisdiction over a defendant:
1. The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.
2. The claim must be one which arises out of or results from the defendant's forum related activities.
3. The exercise of jurisdiction must be reasonable.

Id. Plaintiffs have the burden of proving the existence of jurisdiction, including the element of reasonableness, see Haisten at 1397, but there is a presumption of reasonableness upon a showing that the defendant purposefully directed his activities at forum residents which the defendant bears the burden of overcoming by presenting a compelling case that jurisdiction would be unreasonable. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985).

1. Act Requirement

*7 The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely due to random, fortuitous, or attenuated contacts, or due to the unilateral activity of another party or a third person. Burger King at --, 105 S.Ct. at 2183. Thus, where a defendant deliberately engages in significant activities within the forum state or creates continuing obligations between itself and residents of the forum, it manifestly avails itself of the privilege of conducting business there. Because the benefits and protections of the forum's law shield the defendant's activities, it is presumptively reasonable to require the defendant to submit to the burdens of litigation in the forum. Id. at --, 105 S.Ct. at 2183.

Here, Main Street shipped 600 ' Calibrator' scales to Arizona. It grossed $2,700.00 from the sale of this product to Asco, Inc. Main Street's actions towards the state were deliberate. It wanted to sell its product in the state and create a continuing relationship with retailers to sell the ' Calibrator.' Based upon Main Street's activities and conduct toward the state, it could reasonably anticipate being haled into court here.

The fact no agent of Main Street ever entered Arizona is irrelevant. The Burger King Court stated a defendant cannot avoid jurisdiction over him merely because he did not physically enter the forum State. So long as the commercial actor purposefully directs his efforts towards forum residents, the absence of any physical contacts with the forum will not defeat personal jurisdiction. Id. at --, 105 S.Ct. at 2184. Thus, the court finds **Main Street** purposefully availed itself of the benefits and protections of Arizona's laws by shipping the 600 ' Calibrator' scales into the State.

2. Arising Out of Forum Related Activities

Plaintiffs' claim against **Main Street** is for copyright infringement. They allege **Main Street** copied its box design for the ' Calibron.' 17 U.S.C. § 106 lists the exclusive rights an owner has in a copyrighted work. These rights include the exclusive right to copy, **distribute**, perform, display or exhibit, or produce a derivative work of the copyrighted work. See 17 U.S.C. § 106(1)-(5). Thus, copyright infringement constitutes the **distributing**, performing, displaying or exhibiting, or producing a derivative work of a copyrighted work. Rosenberg, Patent Law

Not Reported in F.Supp.                                                                                    Page 6

Not Reported in F.Supp., 1987 WL 14339 (D.Ariz.), 1987 Copr.L.Dec. P 26,120, 2 U.S.P.Q.2d 1507

**(Cite as: Not Reported in F.Supp.)**

*Fundamentals*, § 5.04[1] at p. 5-27 (2d ed. 1986).

Here, **Main Street** allegedly displayed and exhibited plaintiffs' copyrighted work in Arizona. Such an act constitutes the alleged copyright infringement. Plaintiffs' copyright infringement claim therefore arose out of **Main Street's** forum related activities.

### 3. Reasonableness

Assertion of personal jurisdiction over **Main Street** in this case is reasonable. Where a defendant purposefully avails itself of the benefits and protections of a forum's laws, a presumption exists that the assertion of jurisdiction is reasonable. Burger King at --, 105 S.Ct. at 2185. The defendant must present a compelling case that the presence of some other consideration renders jurisdiction unreasonable. Id. The only consideration presented by Main Street is the fact Arizona is an inconvenient forum for it to litigate this matter. Inconvenience is not a compelling factor to defeat jurisdiction because a defendant may seek a change of venue. Id.

*8 Based upon the above three factors, this court has personal jurisdiction over Main Street and therefore it may be found in Arizona for purposes of 28 U.S.C. § 1400(a). The court concludes venue is proper in Arizona on plaintiffs' copyright infringement claim. Since venue is proper, the court will consider Main Street's motion for a change of venue to the Eastern District of New York pursuant to 28 U.S.C. § 1404(a).

### CHANGE OF VENUE

28 U.S.C. § 1404(a) provides:
For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Main Street, as the defendant, has the burden of establishing this action should be transferred to the Eastern District of New York. Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270, 279 (9th Cir. 1979). The basic factors this court must consider in deciding a motion for change of venue are:1. The plaintiff's choice of forum;
2. The convenience of the parties;
3. The convenience of the witnesses; and
4. The interests of justice.

Consideration of these factors leads the court to deny Main Street's motion for change of venue.

### 1. Plaintiff's Choice of Forum.

A court should not lightly disturb a plaintiff's choice of forum. Northern Acceptance Trust 1065 v. Gray, 423 F.2d 653, 654 (9th Cir. 1970), cert. denied, 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1970). This is especially true where the forum plaintiff chose is not only his domicile but also has a significant connection with the subject matter of the case. Pacific Car and Foundry Co. v. Pence, 403 F.2d 949, 954 (9th Cir. 1968). Here, plaintiffs reside in the District of Arizona and the District has a significant connection with the subject matter of the case. Main Street displayed its alleged copyright infringing boxes in Arizona as well as allegedly caused confusion among consumers here regarding the origin of the ' Calibrator' scale.

### 2. The Convenience of the Parties.

This court will not transfer venue where the transfer will merely shift inconvenience from one party to the other. Such a result will occur in this case if the court grants the motion to transfer. Plaintiffs submitted affidavits testifying to the inconvenience and burden of litigating this case in New York. Main Street's argument that it is inconvenient and burdensome to litigate the case in Arizona is unpersuasive. To the extent travel time inconveniences a party, a change of venue is inappropriate where the transfer only shifts the expense and inconvenience to the other party. Brierwood Shoe Corp. v. Sears Roebuck and Co., 479 F. Supp. 563, 566 (S.D. N.Y. 1979); Microtran Co., Inc. v. Midcom, Inc., 414 F. Supp. 1103, 1105 (E.D. N.Y. 1976); Scaramuzzo v. American Fliers Airline Corp., 260 F. Supp. 746, 748 (E.D. N.Y. 1966). In addition, the availability of copies of Main Street's books and records decreases importance of the fact they are in New York. Ford Motor Co. v. Ryan, 182 F.2d 329, 331 (2nd Cir. 1950).

### 3. Convenience of the Witnesses.

*9 The convenience of the witnesses is perhaps the critical factor for a court considering a motion to change venue. Los Angeles Memorial Coliseum v. National Football League, 89 F.R.D. 497, 501 (C.D. CA. 1981). The court must consider the effect of transfer on the availability of certain witnesses and their live testimony at trial. Id. Here, plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 7

Not Reported in F.Supp., 1987 WL 14339 (D.Ariz.), 1987 Copr.L.Dec. P 26,120, 2 U.S.P.Q.2d 1507

(Cite as: Not Reported in F.Supp.)

submitted the affidavits of witnesses who could testify to the alleged trademark and copyright infringement. In these affidavits, the witnesses testified to the inconvenience of testifying in New York. These witnesses reside in Arizona and would be beyond the Eastern District of New York's subpoena power under Fed. R. Civ. P. 45(e). In contrast, Main Street submitted only the affidavit of its president regarding the inconvenience of appearing in Arizona. It failed to specify the key witnesses it planned to call and outline the scope of their testimony. See Factors, Etc., Inc., v. Pro Arts, Inc., 579 F.2d 215, 218 (2nd Cir. 1978). After balancing the convenience of each party's witnesses, the court finds this factor provides additional support to deny the requested transfer.

### 4. Interest of Justice.

Main Street presents no compelling argument why it is in the interest of justice to transfer this case to the Eastern District of New York. Upon considering the above three factors, the court concludes it is in the interest of justice to deny Main Street's motion for change of venue and keep the suit in Arizona.

IT IS ORDERED denying Main Street's motion to dismiss for improper venue.

IT IS FURTHER ORDERED denying Main Street's motion for change of venue.

> FN1 Since the burden is on Main Street, fairness dictates that in the absence of a showing of the number of sales in each judicial district a presumption that sales were substantially equal in each district is employed by the court.

> FN2 The court notes that after accounting for the dilution factor, Main Street's ' Calibrator' contacts with Oregon, which has one judicial district, amount to 6%. Although 6% is more substantial than the ' Calibrator' contacts with the other districts, the court recognizes the parties would not want to litigate this matter in Oregon which is an inconvenient forum for both parties.

D.Ariz., 1987.
Holder Corp. v. Main Street Distributing
Not Reported in F.Supp., 1987 WL 14339 (D.Ariz.),
1987 Copr.L.Dec. P 26,120, 2 U.S.P.Q.2d 1507

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT D**



410 F.Supp. 171
**(Cite as: 410 F.Supp. 171)**

▷
Idaho Potato Commission v. Washington Potato
Commission,
D.C.Idaho 1976.

United States District Court,D. Idaho.
IDAHO POTATO COMMISSION and the State of
Idaho, Plaintiffs,
v.
WASHINGTON POTATO COMMISSION et al.,
Defendants.
**Civ. No. 1-75-48.**

Oct. 21, 1975.
Opinion on Motion to Dismiss March 10, 1976.

Suit was brought by Idaho and Idaho state agency
for infringement of trademark and for unfair
competition. On motion to dismiss and for change
of venue, the District Court, J. Blaine Anderson, J.,
held that where Idaho was nominal party and state
agency was real party in interest, and state agency
was financially independent and did not perform
governmental function, there was diversity of
citizenship jurisdiction; that where on balance
weight of contacts did not lie in either Washington
or Idaho and inconvenience to parties from
selection of either forum would be equally
disadvantageous, venue would be proper in Idaho
which had been chosen by plaintiffs as forum; that
suit against Washington state agency was not barred
by Eleventh Amendment; that court lacked personal
jurisdiction over corporate defendant that was not
resident of Idaho, was not present and did not
commit act in Idaho from which plaintiffs' cause of
action arose; and that exercise of personal
jurisdiction over individual members of Washington
state agency would be against 'fair play' and '
substantial justice.'

Motions to dismiss complaint and for change of
venue denied; motions to dismiss certain defendants
for lack of personal jurisdiction granted.
West Headnotes

**[1] Federal Courts 170B** ☞283

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(B) Controversies Between Citizens
of Different States
            170Bk283 k. Governmental Bodies and
Officers. Most Cited Cases
        (Formerly 106k307.1(3))
State is not citizen for diversity purposes. 28
U.S.C.A. § 1332.

**[2] States 360** ☞84

360 States
    360II Government and Officers
        360k84 k. Corporations Controlled by State.
Most Cited Cases
In determining relationship between agency and its
sovereign, factors of primary importance are
performance of governmental function and financial
connection or independence between agency and
sovereign.

**[3] Federal Courts 170B** ☞283

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(B) Controversies Between Citizens
of Different States
            170Bk283 k. Governmental Bodies and
Officers. Most Cited Cases
        (Formerly 106k307.1(3))

**Federal Courts 170B** ☞289

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(B) Controversies Between Citizens
of Different States
            170Bk289 k. Necessary and Unnecessary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171

410 F.Supp. 171
(Cite as: 410 F.Supp. 171)

Parties; Nominal or Formal Parties. Most Cited Cases
    (Formerly 106k309)
Where state agency stood in place of and represented state, which was trademark registrant, in guarding against infringement of trademark, state agency was independent self-governing agency financed through its own taxing power, and function of agency was to carry out advertising and promotion which traditionally is not governmental function, state was nominal party and state agency real party in interest, despite fact that state agency did not have express power to sue and be sued, and thus there was diversity of citizenship jurisdiction in suit brought by state and state agency for infringement of trademark and for unfair competition. I.C. §§ 22-1201, 22-1207, 22-1210, 22-1211; Fed.Rules Civ.Proc. rule 17(a), 28 U.S.C.A.; 28 U.S.C.A. § 1332.

**[4] Federal Courts 170B ⟜87.5**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk87 District Where Claim Arose
                170Bk87.5 k. In General. Most Cited Cases
    (Formerly 170Bk87, 106k268(4))
Balancing contacts involved in a given action is reasonable manner of determining "where the claim arose" for venue purposes. 28 U.S.C.A. §§ 1391(b), 1404(a).

**[5] Federal Courts 170B ⟜110**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
            170BII(B)1 In General; Venue Laid in Proper Forum
                170Bk106 Determination in Particular Transferable Actions
                    170Bk110 k. Patents, Copyrights and Trade Regulation. Most Cited Cases
    (Formerly 106k277.1(9))
Where on balance weight of contacts did not lie in either Idaho or Washington and inconvenience to parties from selection of one forum over another would be equally disadvantageous, venue in suit brought by Idaho and Idaho state agency for infringement of trademark and for unfair competition was proper in Idaho which was forum chosen by plaintiffs. 28 U.S.C.A. §§ 1391(b), 1404(a).

**[6] Federal Courts 170B ⟜268.1**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk268 What Are Suits Against States
                170Bk268.1 k. In General. Most Cited Cases
    (Formerly 170Bk268, 106k303(2))
Where Washington state agency, although not granted corporate status by statute, was distinct legal entity designed to enable "producers of agricultural commodities to help themselves" in all aspects of production and marketing, and obligations and liabilities incurred by agency could be enforced only against assets of agency and there could be no liability for debts or actions of agency against state, such agency was not immune under Eleventh Amendment from suit for trademark infringement and unfair competition. RCWA 15.66.020, 15.66.140(5, 6), 15.66.150, 15.66.180, 15.66.230; U.S.C.A.Const. Amend. 11.

**[7] Federal Courts 170B ⟜97**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk97 k. Determination of Venue Questions. Most Cited Cases
    (Formerly 106k277)
Plaintiffs' contention that one defendant's affidavit, which was filed in support of motion to dismiss for lack of personal jurisdiction, was self-serving did not relieve plaintiffs of burden to establish personal jurisdiction and come forth with counteraffidavits or point to facts garnered from discovery which counteracted statements of defendant.

**[8] Federal Courts 170B ⟜71**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171

410 F.Supp. 171
(Cite as: 410 F.Supp. 171)

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk71 k. Territorial Limitations and
Venue in General. Most Cited Cases
      (Formerly 106k268(4))
In order to exercise jurisdiction over a party, there
must be certain minimum contacts with forum state.

**[9] Corporations 101 ☞1.3**

101 Corporations
   101I Incorporation and Organization
      101k1.3 k. Distinct Entity in General,
Corporation As. Most Cited Cases

**Corporations 101 ☞215**

101 Corporations
   101IX Members and Stockholders
      101IX(D) Liability for Corporate Debts and
Acts
         101k215 k. Nature and Grounds in
General. Most Cited Cases
Generally, corporation and its stockholders are
deemed separate and distinct, and stock ownership
in itself is not sufficient to charge parent company
with responsibility for acts of subsidiary.

**[10] Federal Courts 170B ☞82**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk77 Corporations, Actions by or
Against
            170Bk82 k. Agent Within District;
Parent and Subsidiary. Most Cited Cases
      (Formerly 106k274.14(4))
Where Utah corporation became sole stockholder of
advertising agency after advertising campaign
which was subject of suit was begun, there was no
evidence that Utah corporation had performed act
within Idaho or consummated some transaction
having effect in Idaho, and there was no evidence
which would call for piercing of corporate veil
other than fact that such corporation was sole
stockholder of advertising agency, district court did
not have personal jurisdiction over Utah

corporation under Idaho long-arm statute in suit for
trademark infringement and unfair competition.
I.C. § 5-514(a, b).

**[11] Federal Courts 170B ☞71**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk71 k. Territorial Limitations and
Venue in General. Most Cited Cases
      (Formerly 106k268(1))
Jurisdiction over individual officers or employees
of a corporation may not be predicated merely upon
jurisdiction over corporation itself.

**[12] Federal Courts 170B ☞88**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk87 District Where Claim Arose
            170Bk88 k. Wrongful Acts in General.
Most Cited Cases
      (Formerly 106k268(1))
Where tortious activity is alleged to confer personal
jurisdiction under state's long-arm statute, personal
jurisdiction over corporate officer will not lie unless
there is evidence that act by corporate officer was
other than as agent for corporation.

**[13] Federal Courts 170B ☞71**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk71 k. Territorial Limitations and
Venue in General. Most Cited Cases
      (Formerly 106k268(1))
Physical presence in forum is not normally
considered prerequisite to exercise of in personam
jurisdiction over a nonresident; nevertheless, it is a
factor to be weighed in considering reasonableness
of exercising jurisdiction.

**[14] Trademarks 382T ☞1558**

382T Trademarks
   382TIX Actions and Proceedings

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171

410 F.Supp. 171
(Cite as: 410 F.Supp. 171)

Page 4

382TIX(A) In General
    382Tk1557 Jurisdiction
        382Tk1558 k. In General. Most Cited Cases
    (Formerly 382k545, 106k268(4))
Where there was jurisdiction over Washington state agency in suit brought by Idaho and by Idaho state agency for trademark infringement and for unfair competition, and interests of Washington state agency individual members, who held positions analogous to that of corporate officers and directors and who were alleged to have approved advertising plan which was disseminated in Idaho and allegedly infringed trademark, were never physically present in Idaho and viewed their role as directors of agency, exercise of personal jurisdiction over individual members was improper under Idaho long-arm statute and furthermore was unconstitutional as against "fair play" and "substantial justice." I.C. § 5-514.

*173 Paul S. Street, Moffatt, Thomas, Barrett & Blanton, Boise, Idaho, Wayne L. Kidwell, Atty. Gen., Rudolf D. Barchas, Deputy Atty. Gen., Boise, Idaho, for plaintiffs.
Slade Gorton, Atty. Gen., E.E. 'Bill' Rosatto, Sr., Asst. Atty. Gen., Olympia, Wash., Charles C. Flower, Wilson & Flower, Yakima, Wash., Jeremiah A. Quane, John P. Howard, Quane, Smith, Howard & Hamlin, Boise, Idaho, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for defendants.

MEMORANDUM DECISION AND ORDER
J. BLAINE ANDERSON, District Judge.
Plaintiffs, Idaho Potato Commission (I.P.C.) and the State of Idaho, have brought suit under the diversity statute, 28 U.S.C.A. s 1332, and under the Trademark Act, 15 U.S.C.A. s 1121, against defendants for infringement of the trademark 'Idaho' and for unfair competition. The Washington Potato Commission (W.P.C.) and Pacific National Advertising, Inc. have moved to dismiss the complaint predicated upon 28 U.S.C.A. s 1332 and to change venue to the District of Washington for a determination of claims based on the Trademark Act. The matter has been fully briefed and the Court, being fully advised in the premises,

hereinafter renders its Memorandum Decision and Order.

[1] Defendants contend that this Court does not have diversity jurisdiction for the reason that the State of Idaho is not a citizen.[FN1] It is well-settled that a state is not a citizen for diversity purposes. *174 Postal Telegraph Cable Co. v. State of Alabama, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231 (1894). However, the real party in interest, rather than the names of the parties, controls the question of whether there is diversity jurisdiction. Rule 17(a) F.R.C.P. If the State of Idaho participates in this lawsuit as a nominal party only, then jurisdiction exists.

    FN1. It does not appear from the briefs that the defendants are asserting that this court lacks personal jurisdiction.

The real party in interest issue initially requires a determination of what party possesses the right sought to be enforced. Wright & Miller, Federal Practice and Procedure: Civil s 1542, p. 639 (1971). Here, the trademark registrant is the State of Idaho and as such is granted the right to sue for infringement. 15 U.S.C.A. s 1114. The term 'registrant,' however, is defined as including legal representatives, successors and assigns of a registrant. 15 U.S.C.A. s 1127. In its broadest sense, 'legal representative' means one who stands in the place of and represents the interests of another. Black's Law Dictionary, Revised 4th Ed. (1966). By virtue of Idaho Code s 22-1201 et seq., the I.P.C. stands in the place of and represents the interests of the State of Idaho in guarding against infringement of the trademark 'Idaho'. Idaho Code s 22-1207 grants the I.P.C. the following powers:
'. . .s o
8. To define and designate the character of the brands, labels, stencils, or other distinctive marks under which said potatoes may be marketed in order to secure the greatest returns to producers and meet the requirements of their advertising campaign.
9. To devise and arrange for the application of either a seal, label, brand, package, or any other suitable device that will protect the identity of the original Idaho pack of potatoes as near to the final

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171

Page 5

410 F.Supp. 171
(Cite as: 410 F.Supp. 171)

consumer as possible.
10. Whenever and wherever it deems it to be necessary the commission shall use its offices to prevent any substitution of other potatoes for Idaho potatoes and to prevent the misrepresentation or the misbranding of Idaho potatoes at any and all times at any and all points where they discover the same is being done.'

Idaho Code s 22-1207 contemplates that the I.P.C. will administer the application of the mark 'Idaho' to Idaho potatoes. Supervision and control over the use and protection of the mark has been delegated to the I.P.C.

The foregoing analysis is further supported by Rule 17(a) F.R.C.P., for the rule contemplates that a party entitled to sue by a statute is a real party in interest. A party authorized by statute may sue in its own name without joining the party for whose benefit the action is brought. Rule 17(a) F.R.C.P. As stated in Wright & Miller, supra s 1543, p. 644:
'(The) modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to ensure generally that the judgment will have its proper effect as res judicata.'

The I.P.C. could sue without joining the State, yet joinder here provides defendants with protection from a subsequent suit arising from the same set of facts. Since defendants are afforded res judicata protection, there is no conflict with the purpose underlying the real party in interest rule. In summary, it can be seen that the I.P.C. possesses the substantive right sought to be enforced, and is, therefore, under Rule 17(a), the real party in interest.

[2][3] The Court's analysis does not stop here, however, for defendants claim that the I.P.C. is a mere arm or alter ego of the State and, therefore, for purposes of this action, the State is the real party in interest. In analyzing the relationship between an agency and its sovereign, courts have looked to: the agency's ability or lack thereof to sue and be sued, performance by the entity of an essential government function, the agency's power to take property in its own *175 name or in the name of the state, corporate status or lack thereof of the agency,

and the financial interest or lack thereof by the State. See Annot., 6 A.L.R.Fed. 615 (1971). Two factors are of primary importance, namely, performance of a governmental function and the financial connection or independence between the agency and the sovereign. Broadwater-Missouri Water User's Ass'n. v. Montana Power Co., 139 F.2d 998 (9th Cir. 1944); DeLong Corporation v. Oregon State Highway Commission, 233 F.Supp. 7 (D.Ore.1964), affirmed 343 F.2d 911 (9th Cir. 1965); cert. denied382 U.S. 877, 86 S.Ct. 161, 15 L.Ed.2d 119; Fowler v. California Toll-Bridge Authority, 128 F.2d 549 (9th Cir. 1942). The pertinent statutes reveal that the I.P.C. is an independent self-governing state agency which is financed through its own taxing power pursuant to Idaho Code s 22-1211. All costs and expenses incurred by the commission in performing its duties are to be paid out of the commission's fund and there can be no liability of the state beyond the amount of such fund. Idaho Code s 22-1210. Idaho Code s 22-1201 declares the policy of the Act as that of promoting Idaho's potato industry by expanding markets, thereby promoting the general welfare of the people. While the goal of the I.P.C. is to better the welfare of Idaho residents, its function is to carry out advertising and promotion which traditionally is not a governmental function. Commercial advertising is distinguishable from conservation of water resources as in Broadwater-Missouri Water Users' Ass'n. v. Montana Power Co., supra, and the construction of roads and bridges as in DeLong Corporation v. Oregon State Highway Commission, supra, and Fowler v. California Toll-Bridge Authority, supra. The fact that statutes do not expressly confer the power to sue and be sued upon the I.P.C. or declare that it is a body corporate is not dispositive, rather the controlling criteria establishes that the I.P.C. is financially independent and does not perform an essential governmental function. Therefore, it is the conclusion of the Court that the State of Idaho is a nominal party and the I.P.C. is the real party in interest. Accordingly, the Court holds that it has diversity of citizenship jurisdiction.

[4][5] Defendant W.P.C. contends that even if this Court determines that it has diversity of citizenship jurisdiction, it should transfer the action to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171

410 F.Supp. 171
**(Cite as: 410 F.Supp. 171)**

District of Washington pursuant to 28 U.S.C.A. 1404(a), which provides as follows:
'For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.'

Additionally, while defendants concede the Court has subject matter jurisdiction under the Trademark Act, they assert that venue is proper in the District of Washington. Reliance is placed on 28 U.S.C.A. 1391(b), which provides as follows:'A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.'

Since this Court has jurisdiction under both the diversity of citizenship statute and the Trademark Act, the Court must decide if the claim arises here. Balancing the contacts involved in a given action is a reasonable manner of determining 'where the claim arose' for venue purposes. Arnold v. Smith Motor Co., Brookfield, Mo., 389 F.Supp. 1020, 1023-1024 (N.D.Iowa 1974); Honda Associates, Inc. v. Nozawa Trading Co., 374 F.Supp. 886 (S.D.N.Y.1974). Defendants argue that all defendants reside in Washington, witnesses are located there, the relevant acts giving rise to a cause of action took place in Washington and that suit in Idaho would cause defendants a severe burden. On the other hand, plaintiffs assert that they reside in Idaho, witnesses regarding defendant's claim of abandonment of the trademark are located here, and that the damage caused by infringement and unfair competition occurred in Idaho. The case of Honda Associates, Inc. v. Nozawa Trading, Inc., *176 supra, while instructive, offers very little guidance for the reason that the weight of contacts overwhelmingly lay in California. On the facts before this Court, an equal balance of contacts exists between the two states. Were plaintiffs forced to sue in Washington, they would be inconvenienced and the same holds true for defendants if they defend in Idaho.'In cases of trade-mark infringement the wrong takes place not where the deceptive labels are affixed to the goods or where the goods are wrapped in the misleading

packages, but where the passing off occurs. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 639 (2nd Cir. 1956), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76, reh. denied, 352 U.S. 913, 77 S.Ct. 144, 1 L.Ed.2d 120 (1956)"; Honda Associates, Inc., v. Nozawa Trading, Inc., supra, p. 888.

Plaintiffs have chosen this forum to litigate their claims for the reason that this is the place of the wrong and it seems just and equitable to respect that choice where on balance the weight of contacts does not lie in either state and where the inconvenience to the parties is equally disadvantageous if one forum is selected over another. Accordingly, the Court holds that venue is proper in this Court.

[6] The defendant W.P.C. contends that plaintiffs' suit is barred by the Eleventh Amendment. In the recent Supreme Court case of Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), reh. denied, 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777, the Court addressed the question of whether a state agency comes within the prohibition of the Eleventh Amendment.
'. . . (W)hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.
'Thus the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.' Id. at 663, 94 S.Ct. at 1356, 39 L.Ed.2d at 673.

Likewise, the Ninth Circuit Court of Appeals recently stated:'The most important factor in determining whether a particular agency is the 'alter ego' of the State for Eleventh Amendment purposes is 'whether payment of a judgment will have to be made out of the state treasury, i.e., whether the fund in question has both the independent power and resources to pay the judgment without further action by the state legislature or other government officer.'' Hutchison v. Lake Oswego School District No. 7, 519 F.2d 961 (9th Cir. 1975).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171                                                                                              Page 7

410 F.Supp. 171
**(Cite as: 410 F.Supp. 171)**

The Washington Potato Commission's funds are not derived from legislative appropriation, rather its revenue is derived from an annual assessment upon units of agricultural commodities. R.C.W.A. 15.66.150. All monies collected are to be used solely by the Commission and shall not be used by any other commission or department of government. R.C.W.A. 15.66.180. Moreover, all obligations and liabilities incurred by the Commission shall be enforced only against the assets of the Commission and there can be no liability for debts or actions of the Commission against the State or any subdivision or instrumentality thereof. R.C.W.A. 15.66.230. Cf. Robison v. Dwyer, 58 Wash.2d 576, 364 P.2d 521, 525 (1961). Under the standard of Edelman, supra, the Eleventh Amendment is no shield to the W.P.C. Cf. Missouri, K. & T.R. Co. v. Missouri Railroad & Warehouse Comrs., 183 U.S. 53, 22 S.Ct. 18, 46 L.Ed. 78 (1901).

The Ninth Circuit in Hutchison viewed four other factors with regard to an agency's immunity under the Eleventh Amendment, namely: performance by the entity of an essential governmental function, ability to sue and be sued, power to take property in its own name and corporate status. As previously stated, the I.P.C. does not perform an essential *177 governmental function and that holding is applicable to the W.P.C. for the function and purpose of the agencies in the respective states are the same. The W.P.C. may institute and maintain all legal actions in its own name, R.C.W.A. 15.66.140(6) and take property in its own name. R.C.W.A. 15.66.140(5). Although the W.P.C. has not been granted 'corporate status' by statute, that factor alone is not determinative, for when viewing the totality of characteristics indicating the independency of the W.P.C., it is a distinct legal entity designed to enable 'producers of agricultural commodities to help themselves' in all aspects of production and marketing. R.C.W.A. 15.66.020. Annot., 6 A.L.R.Fed. 615, 632 (1971). The W.P.C. is therefore not immune from suit under the Eleventh Amendment.

Defendant relies on Robison v. Dwyer, supra, for the proposition that the W.P.C., like the Washington Wheat Commission, is a state agency. Even reading Robison for the proposition that the

W.P.C. can be labeled a state agency, the label attached is of little significance in light of standards of Edelman and Hutchison. Defendant further contends that the State of Washington has consented to suit only in the Courts of Washington. This suit, however, is not against the State of Washington, and as has been previously stated, the State cannot be held liable for debts or liabilities of the W.P.C.

In light of the foregoing,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendants Washington Potato Commission and Pacific National Advertising Agency, Inc.'s motions to dismiss the complaint and/or for a change of venue are DENIED.

### ON MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION.

Presently pending before the Court are motions to dismiss filed by David W. Evans, Inc. and members of the Washington Potato Commission. The Court, being fully advised in the premises, hereinafter renders its Memorandum Decision and Order.

### I.

### DEFENDANT DAVID W. EVANS, INC.'S MOTION TO DISMISS

Plaintiffs original complaint named as a defendant, among others, Pacific National Advertising Agency, Inc. On November 10, 1975, plaintiffs filed an amended complaint which named, in addition to defendant Pacific National Advertising Agency, Inc., among others, defendants David W. Evans, Inc. and Evans/Pacific, Inc. Plaintiffs recite in the Amended Complaint that Pacific National Advertising Agency, Inc. merged with David W. Evans, Inc., resulting in Evans/Pacific, Inc., a wholly-owned subsidiary of David W. Evans, Inc.

On January 15, 1976, defendant David W. Evans, Inc. filed a motion to dismiss and quash service.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171
**(Cite as: 410 F.Supp. 171)**

The motion, supported by affidavit, raises the issue of whether this Court has personal jurisdiction. Plaintiffs assert that personal jurisdiction exists under the Idaho long-arm statute, Idaho Code 5-514(a), (b) which states as follows:

'Acts subjecting persons to jurisdiction of courts of state.-Any person, firm, company, association or corporation, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits said person, firm, company, association or corporation, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:

(a) The transaction of any business within this state which is hereby defined as the doing of any act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact or enhance the business purpose or objective or any part *178 thereof of such person, firm, company, association or corporation;

(b) The commission of a tortious act within this state;

. . . .'com

Plaintiffs assert that since this Court has personal jurisdiction over defendants Washington Potato Commission and Evans/Pacific, Inc., formerly Pacific National Advertising Agency, Inc., it clearly must have jurisdiction over defendant David W. Evans, Inc. Plaintiffs' argument is based on the allegations of the amended complaint and supported by exhibits that infringing advertisements have continued after the purchase of Pacific National Advertising Agency, Inc. by David W. Evans, Inc. This Court is of the view, however, that personal jurisdiction does not exist with regard to David W. Evans, Inc.

Defendant has filed an affidavit by George Robert Ruff, President of David W. Evans, Inc. Mr. Ruff's affidavit states the following facts:

1. David W. Evans, Inc., a Utah corporation, owns all of the outstanding stock of Evans/Pacific, Inc., a Washington corporation, as a result of a transaction made on or about April 11, 1975. Previous to that

time, Evans/Pacific, Inc. was known as Pacific National Advertising Agency, Inc., a Washington corporation.

2. The advertising campaign of the Washington Potato Commission, which is the subject of this lawsuit, was begun many months prior to the acquisition of Pacific National Advertising Agency, Inc., by David W. Evans, Inc.

3. The Washington management remained intact after the said acquisition and said company was then and is now operated independently from the operations of David W. Evans, Inc., a Utah corporation. The directors, management and employees of David W. Evans, Inc. played no role in any aspect of the advertising campaign for the Washington Potato Commission. David W. Evans, Inc. and its officers, directors and employees played no part in providing services with respect to the advertising campaign of the Washington Potato Commission.

4. David W. Evans, Inc. is not a party to any contract with the Washington Potato Commission or its members or the State of Washington. David W. Evans, Inc. has not written nor placed nor disseminated any advertising material for the said Washington Potato Commission, its members, or the State of Washington.

5. David W. Evans, Inc. does not now have, and at no time material to these proceedings, had any officer, employees or property of any kind located in the State of Idaho. David W. Evans, Inc. does not hold itself out as doing business in the State of Idaho, and has not heretofore at any time material to these proceedings held itself out as doing business in the State of Idaho. It has not qualified to do business in the State of Idaho.

6. David W. Evans, Inc. has no active customers with principal offices in the State of Idaho.

[7] Plaintiff responds to Ruff's affidavit by concluding that it is self-serving; however, that does not relieve the plaintiff of his burden to establish personal jurisdiction and to come forth with counter-affidavits or point to facts garnered from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171

Page 9

410 F.Supp. 171
(Cite as: 410 F.Supp. 171)

discovery which counteract the statements of the affiant. Such principles facilitate the proper disposition of matters before this Court, principles which plaintiff has failed to adhere to. Taylor v. Portland Paramount Corporation, 383 F.2d 634 (9th Cir. 1967).

[8] In order for this Court to exercise jurisdiction over a party, there must be certain minimum contacts with the State of Idaho. Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); International Shoe Company v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Doggett v. Electronics Corp. of America, 93 Idaho 26, 454 P.2d 63 (1969); See, Akichika v. Kellerher, 96 Idaho 930, 539 P.2d 283 (1975). To determine whether personal *179 jurisdiction exists in a given case, the Ninth Circuit has adopted the following test:
'(1) The nonresident defendant must do some act or consummate some transaction within the forum. It is not necessary that defendant's agent be physically within the forum, for this act or transaction may be by mail only. A single event will suffice if its effects within the state are substantial enough to qualify under Rule Three.
"(2) The cause of action must be one which arises out of, or results from, the activities of the defendant within the forum. It is conceivable that the actual cause of action might come to fruition in another state, but because of the activities of defendant in the forum state there would still be a ' substantial minimum contact.'
"(3) Having established by Rules One and Two a minimum contact between the defendant and the state, the assumption of jurisdiction based upon such contact must be consonant with the due process tenets of 'fair play' and 'substantial justice. ' If this test is fulfilled, there exists a 'substantial minimum contact' between the forum and the defendant. The reasonableness of subjecting the defendant to jurisdiction under this rule is frequently tested by standards and analogous to those of forum non conveniens.' 47 Georgetown L.J. 342, 351-52 (1958).' L. D. Reeder Contractors of Arizona v. Higgins Industries, Inc., 265 F.2d 768, 773-774, n. 12 (9th Cir. 1959); Aanestad v. Beech

Aircraft Corporation, 521 F.2d 1298, 1300 (9th Cir. 1974).

Plaintiff fails the test. There is no evidence that David W. Evans, Inc. is connected with the acts which are the subject of this lawsuit. David W. Evans, Inc. has not performed an act within the state or consummated some transaction having an effect in Idaho. Failing the first element of the Reeder test, it is impossible for this Court to conclude that the cause of action arose out of, or results from, the activities of defendant David W. Evans, Inc. within the forum. A failure to establish at least one minimum contact results in the inevitable conclusion that to uphold jurisdiction would not comport with fair play and substantial justice.

[9] Plaintiff relies on David W. Evans, Inc.'s ownership of stock in Evans/Pacific, Inc. as supplying the nexus with the latter's activities in this state.
'When a subsidiary of a foreign corporation is carrying on business in a particular jurisdiction, the parent is not automatically subject to jurisdiction in the state. Thus, if the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary.' Wright & Miller, Federal Practice and Procedure, Civil s 1069, pp. 255-256 (1969).

Generally, a corporation and its stockholders are deemed separate and distinct, and stock ownership in itself is not sufficient to charge the parent company with responsibility for acts of the subsidiary. Cannon Manufacturing Company v. Cudahy Packing Company, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); Farkas v. Texas Instruments, Inc., 429 F.2d 849 (1st Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1193, 28 L.Ed.2d 324 (1971); Spears v. Transcontinental Bus System, Inc., 226 F.2d 94 (9th Cir. 1955), cert. denied, 350 U.S. 950, 76 S.Ct. 326, 100 L.Ed. 828 (1956); Jackson v. Continental Trailways, Inc., 65 F.R.D. 451 (D.Nev.1974); Frito-Lay, Inc. v. Proctor & Gamble Company, 364 F.Supp. 243 (N.D.Texas 1973); Hayashi v. Sunshine Garden Products, Inc.,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171

410 F.Supp. 171
(Cite as: 410 F.Supp. 171)

285 F.Supp. 632 (W.D.Wash.N.D.1967) affirmed, 396 F.2d 13 (9th Cir. 1968); Wirtz v. Mercantile Stores Company, 271 F.Supp. 830 (E.D.Okla.1967) ; Eastern Industries v. Traffic Controls, Inc., 142 F.Supp. 381 (D.Del.1956).

[10] There is no evidence before this Court that David W. Evans, Inc. controlled the advertising campaign which is *180 the subject of this lawsuit. Similarly, there is no evidence which would call for the piercing of the corporate veil, other than the fact that David W. Evans, Inc. was the sole stockholder of Evans/Pacific, Inc. Mere stock ownership is insufficient to disregard the separate personality between parent and subsidiary and find personal jurisdiction over the parent. Since it is clear that David W. Evans, Inc. was not a resident of Idaho, was not present and did not commit an act in this state from which plaintiffs' cause of action arose, the Court finds that it lacks personal jurisdiction over David W. Evans, Inc.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendant David W. Evans, Inc.'s motion to dismiss be GRANTED, and, further, that plaintiffs' action be DISMISSED WITHOUT PREJUDICE as to David W. Evans, Inc.

II.

DEFENDANT MEMBERS OF THE WASHINGTON POTATO COMMISSION'S MOTION TO DISMISS

On October 21, 1975, this Court entered its Memorandum Decision and Order which decided, among other issues, that venue was proper in this forum. Normally, matters of venue are more appropriately addressed after the issue of personal jurisdiction has been decided; however, as this Court pointed out in footnote 1 of its Memorandum of October 21, 1975, it did not appear from defendants' briefs that they were raising the issue of lack of personal jurisdiction. At the hearing on defendants' motion to reconsider this Court

expressed doubts as to whether personal jurisdiction existed over the individual members of the Washington Potato Commission. The parties have addressed this issue in briefs and the matter is submitted.[FN1]

> FN1. The issue raised by defendant members of the Washington Potato Commission is closely analogous to the issue covered in Part I of this Memorandum.
> 'A problem analogous to that raised by the question of when service on a subsidiary constitutes service on the parent corporation is presented when plaintiff is seeking to acquire jurisdiction over the principals of a corporation on an individual basis, and the individuals contend that all of their acts within the jurisdiction were carried out solely in a corporate capacity.' Wright & Miller, Federal Practice and Procedure, Civil s 1069, Supp. p. 28 (1976)
> In Part I of this Memorandum the Court explored the existence of a nexus between the State of Idaho and David W. Evans, Inc. and found that such a nexus was lacking. Here, there is a nexus between the individual members of the Washington Potato Commission, but the issue is whether the nexus is sufficient for this Court to exercise personal jurisdiction.

Proper analysis of this issue must begin with basic precepts summarized by the Idaho Supreme Court in Akichika v. Kellerher, 96 Idaho 930, at 932-933; 539 P.2d 283, 285 (1975):
'Considering the complexities of modern commercial transactions, questions of this nature do not lend themselves to a mechanical analysis; rather each case must be considered in light of its particular jurisdictional facts.
'. . . I.C. s 5-514 must be liberally construed. The statute was designed to provide a forum for Idaho residents; 'as such, the law is remedial legislation of the most fundamental nature' . . . By enacting the statute the legislature intended to exercise all the jurisdiction available to the State of Idaho under the due process clause of the United States Constitution.' (citations omitted)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171                                                                                          Page 11

410 F.Supp. 171
(Cite as: 410 F.Supp. 171)

[11] Individual members of the Washington Potato Commission hold a position with the Commission which is closely analogous to the relationship of officers and directors to a corporation. Therefore, this Court addresses the issue of personal jurisdiction over the members in the same light as it would address the issue of personal jurisdiction over officers and directors in a corporation. It is settled that jurisdiction over individual officers and employees of a corporation may not be predicated merely upon jurisdiction over the corporation *181 itself. Weller v. Cromwell Oil Company, 504 F.2d 927 (6th Cir. 1974); Wilshire Oil Company of Texas v. Riffe, 409 F.2d 1277, 1281, footnote 8 (10th Cir. 1969); Lehigh Valley Industries, Inc. v. Birenbaum, 389 F.Supp. 798 (S.D.N.Y.1975); Path v. Instruments International Corp. v. Asahi Optical Co., 312 F.Supp. 805 (S.D.N.Y.1970); Willner v. Thompson, 285 F.Supp. 394 (E.D.N.Y.1968).

'. . . jurisdiction over individual officers and employees of a corporation may not be predicated on the court's jurisdiction over the corporation itself, unless the individuals are engaged in activities within the jurisdiction that would subject them to the coverage of the state's long-arm statute.' Wright & Miller, Federal Practice and Procedure, Civil s 1069, Supp. p. 28 (1976)

[12] In Willner v. Thompson, supra, plaintiff sued in New York a California corporation and its president. The action was for breach of contract and jurisdiction was alleged under the 'doing business' clause of New York's long-arm statute. In granting the president's motion to dismiss, the court reasoned: 'Plaintiffs admit that this defendant conducted no business in New York in his own right and they made no showing that the activities of the corporation may be attributed to him as the corporation's alter ego. Plaintiffs do not allege that the corporate entity is a mere facade or sham to protect the individual defendant. Since the corporate defendant is not an agent of the individual defendant, its acts cannot possibly be attributed to him. It follows that the individual defendant did not transact any business in New York and could not be validly served in California . . .' (emphasis supplied) 285 F.Supp. at 397.

The court in Path Instruments International Corp. v. Asahi Optical Co., supra, followed the reasoning in Willner v. Thompson, supra, and adhered to the distinction between corporate business conducted by an officer and business conducted by an officer of a corporation in his own behalf. See also: Schenin v. Micro Copper Corp., 272 F.Supp. 523 (S.D.N.Y.1967); Unicon Management Corp. v. Koppers Company, 250 F.Supp. 850 (S.D.N.Y.1966). The same substantive distinction applies in cases where tortious activity is alleged to confer personal jurisdiction under a state's long-arm statute, such that unless there is evidence that the act by the corporate officer was other than as an agent for the corporation, then personal jurisdiction over the corporate officer will not lie. Fashion Two Twenty, Inc. v. Steinberg, 339 F.Supp. 836, 842 (E.D.N.Y.1971).

Of the cases previously referred to, the most analogous is Weller v. Cromwell Oil Company, supra, wherein plaintiff instituted an action in Ohio against a California corporation and two of its officers for breach of two distributorship contracts. Plaintiff alleged fraud and misrepresentation by the officers in connection with negotiations regarding the contracts. Jurisdiction was predicated under the Lanham Act, among other grounds. The Sixth Circuit Court of Appeals ruled that the Ohio long-arm statute would not extend to reach corporate officers and the court further stated: 'But even if the statute were construed to permit suit in Ohio we would still be faced with grave questions as to its constitutionality. We have serious doubt whether the activities of the corporate officers in behalf of the corporations set forth in Weller's affidavit are sufficient so as to make it reasonable and just, consistent with traditional notions of fair play, and in conformity with due process requirements of the Fourteenth Amendment that the individuals be subjected to suit in Ohio to enforce personal liability arising out of such activities.' (citations omitted)

'If such suits against officers of national corporations were ever permitted, the individuals could be sued in every state of the union whenever they make telephone calls or write letters to a customer who claims that *182 they constitute misrepresentations.' 504 F.2d at 931.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171
(Cite as: 410 F.Supp. 171)

[13][14] It is alleged in the complaint that members of the Washington Potato Commission approved an advertising plan which was disseminated in this forum and infringed the Idaho Potato Commission's trademark. Conceptually, it is difficult to distinguish the facts in this case from the following hypothetical factual situation. If Corporation A from State X sends Employee B into State Y to deliver certain products, and B crashes his delivery truck, injuring Resident C in State Y, then jurisdiction over both A and B exists in State Y. The result flows from the commission of a tortious act within the purview of State Y's long-arm statute. Comparing the facts of this case with the hypothetical factual situation, both the members and Employee B can be said to have committed acts from which a cause of action has arisen. Whether personal jurisdiction would lie, however, must be measured by inquiring whether the exercise of such jurisdiction comports with 'fair play' and 'substantial justice'. A distinguishing feature between the hypothetical and the case at hand rests with the fact that here the members of the Washington Potato Commission were never physically present in Idaho; rather their activities occurred in Washington and had an alleged effect in Idaho.[FN2] While in both cases a nexus with the distant forum exists, in the matter at hand the connection is more tenuous. It is proper to hold that a corporation which engages in activity having ramifications beyond the state in which it is physically present may have sufficient connection with a distant forum where the ramifications are felt. Yet, it is quite another matter to hold that an individual working for that same corporation, who has never been present in the distant forum with regard to a corporate transaction, has a similar connection with the distant forum. The same rationale applies equally to the members of the Washington Potato Commission.

> FN2. Physical presence in the forum is not normally considered a prerequisite to an exercise of in personam jurisdiction over a nonresident; nevertheless, it is a factor to be weighed in considering the reasonableness of exercising jurisdiction.

A second distinguishing aspect lies in the expectancy interest of the members as contrasted with the hypothetical employee. It is doubtful that the individual members of the Commission could reasonably have anticipated that their activity in Washington could subject them to personal liability in a distant state such as Idaho.[FN3] Rather, it is uncontradicted that they viewed their role as directors of the Commission and that any liability which flowed from performance of that function would be deemed activity of the Commission. R.C.W.A. 15.66.230.[FN4] The situation here is much like activity by a corporate employee who, by performing corporate business, causes the corporation to purposefully avail itself of the *183 laws of another state. Absent a ruse to conceal an employee's personal activity behind the corporate shield, [FN5] it is most difficult to conclude that the employee purposefully availed himself of a distant forum's laws.[FN6] Additionally, this Court finds that Idaho plaintiffs' and the State of Idaho's interest in extending its jurisdiction to the fullest extent consistent with due process, is not seriously harmed where there is jurisdiction over the corporation which committed acts within the state, or, as in the case at hand, jurisdiction over the Commission.

> FN3. A different conclusion may result if the members' acts were dishonest, criminal or where such acts in the name of the Commission constituted a subterfuge for conducting personal activities.

> FN4. R.C.W.A. 15.66.230:
> 'Liability of commission, state, etc. Obligations incurred by any commission and any other liabilities or claims against the commission shall be enforced only against the assets of such commission in the same manner as if it were a corporation and no liability for the debts or actions of the commission shall exist against either the state of Washington or any subdivision or instrumentality thereof or against any other commission established pursuant to this chapter or the assets thereof or against any member officer, employee or agent of the board in his individual capacity. The members of any such commission, including employees of such board, shall not be held responsible individually in any way whatsoever to any person for errors in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410 F.Supp. 171

Page 13

410 F.Supp. 171
**(Cite as: 410 F.Supp. 171)**

judgment, mistakes, or other acts, either of commission or omission, as principal, agent, person or employee, except for their own individual acts of dishonesty or crime. No such person or employee shall be held responsible individually for any act or omission of any other member of any such commission. The liability of the members of such commission shall be several and not joint and no member shall be liable for the default of any other member.'

> FN5. '. . . if the corporation is not a viable one and the individuals are in fact conducting personal activities and using the corporate form as a shield, a court may feel compelled to pierce the corporate veil and permit assertion of personal jurisdiction over the individuals.' Wright & Miller, Federal Practice and Procedure, supra, at p. 28.

> FN6. '. . . it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 at 1298.

In light of the foregoing cases, this Court is satisfied that the exercise of jurisdiction over the individual members is improper under Idaho Code 5-514. Furthermore, on the facts of this case, the exercise of jurisdiction over the individual members of the Washington Potato Commission would be against ' fair play' and 'substantial justice' and is therefore unconstitutional.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendant individual members' motion to dismiss is GRANTED, and, further, that plaintiffs' action against them is DISMISSED WITHOUT PREJUDICE, and further,

The Court having been advised that this matter is ready for pre-trial proceedings,

IT IS HEREBY ORDERED that any remaining answers be filed by March 25, 1976; that the parties make a good faith effort to comply with Local Rule 10 of this Court, and draft an agreed upon pre-trial order not later than April 16, 1976. A trial date will be set after submission of an agreed upon pre-trial order.

D.C.Idaho 1976.
Idaho Potato Commission v. Washington Potato Commission
410 F.Supp. 171

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT E**



621 F.Supp. 1204

**(Cite as: 621 F.Supp. 1204)**

▷
Koch Engineering Co., Inc. v. Monsanto Co.
D.C.Mo.,1985.

United States District Court, E.D. Missouri, Eastern
Division.
KOCH ENGINEERING CO., INC., Plaintiff,
v.
MONSANTO COMPANY, Defendant.
**No. 85-1578C(1).**

Dec. 6, 1985.

Supplier brought declaratory judgment action to
determine rights of parties under contract wherein
supplier agreed to provide internal components for
purchaser's distillation tower located in Texas. Two
weeks later, purchaser filed action in federal district
court in Texas, alleging breach of contract, breach of
warranty, negligence, and violation of Texas
Deceptive Trade Practices Act. Supplier brought
motion in declaratory judgment action to enjoin
purchaser from proceeding in Texas action, and
purchaser brought motion to dismiss or, in the
alternative, to transfer. The District Court, Nangle,
Chief Judge, held that best interest of comity and
judicial economy were served by dismissing
declaratory judgment action and allowing Texas
action to proceed.

Dismissed.
West Headnotes
**[1] Declaratory Judgment 118A ⚬⚬⚬5.1**

118A Declaratory Judgment
   118AI Nature and Grounds in General
     118AI(A) In General
      118Ak5 Discretion of Court
       118Ak5.1 k. In General. Most Cited
Cases
   (Formerly 118Ak5)
Decision whether to entertain petition for declaratory
judgment is within discretion of federal district court,
although such discretion is not without limits.
V.T.C.A., Bus. & C. § 17.41 et seq.

**[2] Declaratory Judgment 118A ⚬⚬⚬2**

118A Declaratory Judgment

   118AI Nature and Grounds in General
     118AI(A) In General
      118Ak2 k. Object and Purpose. Most Cited
Cases
Purpose of Declaratory Judgment Act [28 U.S.C.A. §
2201] is to provide remedy to minimize danger of
avoidable loss and unnecessary accrual of damages
and to afford early adjudication to one threatened
with liability.

**[3] Federal Courts 170B ⚬⚬⚬1145**

170B Federal Courts
   170BXIII Concurrent and Conflicting Jurisdiction
and Comity as Between Federal Courts
     170Bk1145 k. Pendency and Scope of Prior
Proceedings; Prisoners Under Arrest. Most Cited
Cases
" First to file rule" generally requires that where two
identical actions are filed in courts of concurrent
jurisdiction, court which first acquired jurisdiction
should try lawsuit, but such rule is not absolute.

**[4] Federal Courts 170B ⚬⚬⚬1131.1**

170B Federal Courts
   170BXIII Concurrent and Conflicting Jurisdiction
and Comity as Between Federal Courts
     170Bk1131 Exclusive or Concurrent
Jurisdiction
      170Bk1131.1 k. In General. Most Cited
Cases
   (Formerly 170Bk1131)
Federal courts must consider each case individually
in deciding questions of concurrent jurisdiction.

**[5] Federal Courts 170B ⚬⚬⚬1131.1**

170B Federal Courts
   170BXIII Concurrent and Conflicting Jurisdiction
and Comity as Between Federal Courts
     170Bk1131 Exclusive or Concurrent
Jurisdiction
      170Bk1131.1 k. In General. Most Cited
Cases
   (Formerly 170Bk1131)
In determining question of concurrent jurisdiction,
federal court must consider which of two actions will
best serve needs of parties by providing
comprehensive solution to entire controversy.

[6] Federal Courts 170B ☞1145

170B Federal Courts
    170BXIII Concurrent and Conflicting Jurisdiction and Comity as Between Federal Courts
        170Bk1145 k. Pendency and Scope of Prior Proceedings; Prisoners Under Arrest. Most Cited Cases
Best interests of comity and judicial economy were served by dismissing declaratory judgment action brought by supplier in federal district court in Missouri to determine right of parties under contract and allowing purchaser's action brought in federal district court in Texas, alleging breach of contract, breach of warranty, negligence and violation of Texas Deceptive Trade Practices Act [V.T.C.A., Bus. & C. § 17.41 et seq.] to proceed, even though declaratory judgment action was filed two weeks prior to action brought in Texas, where dismissal of declaratory judgment action would not cause additional loss or result in unnecessary accrual of damages, supplier had participated in settlement negotiations for almost two years, and thus, was not dependent on declaratory judgment action for early adjudication, and suit in Texas court would fully resolve controversy between parties, particularly where supplier sought no damages in declaratory judgment action.

William E. Shull, Koch Engineering Co., Wichita, Kan., Thomas Lake, St. Louis, Mo., for plaintiff.
John S. Sandberg, Paul N. Venker, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
This case is now before the Court on defendant's motion to dismiss or, in the alternative, to transfer and plaintiff's motion to enjoin defendant from proceeding in the United States District Court for the Southern District of Texas. For the reasons stated herein, defendant's motion to dismiss is granted. Accordingly, plaintiff's motion to enjoin is denied and defendant's alternative motion to transfer is denied as moot.

This action arises out of an agreement between Koch Engineering Company, Inc. *1206 (Koch) and Monsanto Company (Monsanto) entered into on or about June 23, 1982. Under the terms of the agreement, Koch would supply Monsanto internal components for refurbishing an ethyl benzene-styrene

monomer distillation column (the tower). The tower is located at Monsanto's plant in Texas City, Texas. Monsanto, in a separate agreement, contracted with Brooks Erection and Construction Company to install the components furnished by Koch.

During August, 1983, following the completion of the refurbishment, Monsanto informed Koch that the tower was not performing properly. Monsanto made demands on Koch under the warranty provisions of the contract. For the next two years, the parties took various actions and made a variety of demands in attempts to resolve the dispute. The parties met most recently in Wichita in July, 1985. At that meeting, Monsanto informed Koch that it had suffered damages of 11.2 million dollars. According to Monsanto, Koch was also informed that the Texas statute of limitations required Monsanto to file suit in early August.

On July 11, 1985, following two unsuccessful attempts to resolve the dispute, Koch filed this declaratory judgment action in the Eastern District of Missouri. Koch requests this Court to declare the rights of the respective parties under the contract between Koch and Monsanto. Jurisdiction is based on diversity of citizenship of the parties.[FN1] 28 U.S.C. § 1332.

> FN1. Monsanto is a corporation organized under the laws of Delaware and its principal place of business is St. Louis, Missouri. Koch is organized under the laws of Kansas and its principal place of business is also Kansas.

On July 25, 1985, two weeks after Koch filed this action, Monsanto filed a five count complaint in the United States District Court for the Southern District of Texas. Monsanto's complaint alleges inter alia, breach of contract, breach of warranties, negligence and deceptive trade practices under the Texas Deceptive Trade Practices-Consumer Protection Act. Tex.Bus. & Com.Code Ann. § 17.41 et seq. Neither action has progressed past the initial pleading stage. Monsanto has not yet answered Koch's complaint but instead seeks to have it dismissed, or in the alternative, transferred to the Southern District of Texas. Koch on the other hand, seeks an injunction against further proceedings in the Texas action, pending resolution of the declaratory judgment suit filed in this Court. The parties and this Court are in agreement that only one action is necessary to resolve

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this dispute. The question for this Court is which of the two actions should proceed. For the reasons stated below, this Court finds that the action pending in the Southern District of Texas is the appropriate and proper suit to resolve the parties' dispute.

[1] The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that " any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." There is no dispute that this Court has the authority to entertain Koch's petition for declaratory judgment. This decision however, is within the discretion of the district court. The Declaratory Judgment Act " gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." *Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 112, 82 S.Ct. 580, 581, 7 L.Ed.2d 604 (1962)* (per curiam). It is clear that this discretion is not without limits. " [A] district court cannot decline to entertain such an action as a matter of whim or personal disinclination." *Id.*

[2] In deciding whether to allow Koch to proceed in this lawsuit, the court must look to the purpose of the Declaratory Judgment Act. The Act was intended to provide a remedy which would " minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication without waiting until his adversary should see fit to begin an action after the damage has accrued." 10A C. Wright, A. *1207 Miller and M. Kane, *Federal Practice and Procedure* § 2751 at 569 (1983). In reviewing the facts of this case in a light most favorable to Koch, it is clear to this Court that allowing this suit to proceed under these circumstances would not promote any of the purposes of the Declaratory Judgment Act.

The plaintiff has not identified any loss that can be avoided through the use of the Declaratory Judgment remedy. The breach of contract, if it occurred at all, took place on or about August, 1983. At that time, Monsanto informed Koch that the tower's output was not up to the specifications as required by the contract. Neither Monsanto nor Koch has alleged any continuing damages arising from this alleged breach of contract. Therefore, this Court's decision to refuse to entertain Koch's petition will not cause additional loss or result in the unnecessary accrual of damages.

The Act's purpose of providing an early adjudication

to one threatened with liability would also not be promoted by a use of the declaratory judgment remedy in this case. The parties agree that settlement negotiations took place as late as July, 1985. This Court will assume that the parties undertook those and prior negotiations in good faith. In view of the fact that Koch participated in settlement negotiations for almost two years, Koch could not, nor does it, argue that declaratory judgment is necessary to insure that Koch is afforded an early adjudication. Again, this Court finds that the decision to refuse to entertain Koch's petition will not frustrate the purpose of the Declaratory Judgment Act.

[3][4] Koch, in its memorandum in opposition to Monsanto's motion to dismiss, attaches great weight to the fact that Koch's suit for declaratory judgment was the first suit filed. Generally, the doctrine of federal comity and efficient judicial administration indicate that when " two identical actions are filed in courts of concurrent jurisdiction, the court which first acquired jurisdiction should try the lawsuit and no purpose would be served by proceeding with a second action." *Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93 (9th Cir.1982).* The first to file rule however, is not one of absolutes. The Eighth Circuit has specifically avoided fashioning a rigid or inflexible rule for determining the priority of cases pending in federal courts involving identical claims or subject matter. *Orthmann v. Apple River Campground, Inc., 765 F.2d 119, 121 (8th Cir.1985); Florida v. United States, 285 F.2d 596, 604 (8th Cir.1960).* In a time of an increasingly crowded federal docket, the courts must consider each case individually in deciding questions of concurrent jurisdiction. In considering this case, it is clear to this Court that the first to file rule should not be applied.

As an initial matter, it is important to note that the two actions are not identical. Koch's action in this Court seeks a declaration of the parties' rights under the contract. Monsanto's action, filed in the Southern District of Texas, seeks damages for breach of contract, breach of warranty, negligence and a violation of the Texas Deceptive Trade Practices Act. Had it not been for the Declaratory Judgment Act, Koch could not have filed this or any other lawsuit. It is this use of the Act, to which this Court objects. Koch's suit, while furthering none of the goals of the Declaratory Judgment Act, represents only a race to the courthouse. This type of procedural fencing denies the injured party his right to choose the forum in which to seek redress.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

621 F.Supp. 1204

621 F.Supp. 1204

(Cite as: 621 F.Supp. 1204)

This Court is not the first court to object to this use of the Declaratory Judgment Act. In a similar situation involving a personal injury claim, the Seventh Circuit noted that " to compel potential personal injury plaintiffs to litigate their claims at a time and in a forum chosen by the alleged tort-feasor would be a perversion of the Declaratory Judgment Act." *Cunningham Brothers, Inc. v. Bail,* 407 F.2d 1165, 1167 (7th Cir.1969) *cert. denied,* 395 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745 (1969). Koch, in response to this argument, cites this Court to numerous cases wherein the Declaratory Judgment Act was used to resolve a breach of contract dispute. In those cases, the declaratory judgment defendant**1208** counterclaimed for its breach of contract damages and the cases proceeded to trial in that posture. The cases do not support Koch's argument that this Court should uphold Koch's choice of forum over the objection of Monsanto. In none of the cases cited by Koch was this issue raised and decided upon by the court.

[5][6] This Court must also consider which of the two actions will best serve the needs of the parties by providing a comprehensive solution to the entire controversy. *Ven-Fuel, Inc. v. Dept. of the Treasury,* 673 F.2d 1194, 1195 (11th Cir.1982); *Hypro, Inc. v. Seeger-Wanner Corp.,* 292 F.Supp. 342, 344 (D.Minn.1968). Koch contends that Monsanto will be required to raise all its claims against Koch as compulsory counterclaims pursuant to Rule 13 of the Federal Rules of Civil Procedure. Regardless of whether this is true or not, Koch's request for an injunction is premature until such time as this Court is convinced that this suit will completely resolve the controversy. This leaves the parties with two lawsuits involving the same controversy in two different federal courts. On the other hand, it is quite obvious to this Court even at this early stage in the proceedings that Monsanto's suit in the Southern District of Texas will fully resolve the controversy between the parties. By dismissing Koch's petition for declaratory judgment, this Court avoids both the uncertainty of a possibly premature injunction and/or the burden and expense on the courts and the parties associated with duplicate lawsuits.

Upon consideration of the facts in this case, this Court finds that the best interest of comity and judicial economy are served by dismissing Koch's complaint for declaratory judgment. Accordingly, defendant's motion for a transfer of venue is moot

and the arguments for said transfer were not considered in rendering this decision. This Court is certain that the Texas Court will give full and adequate consideration to any motion for a change of venue.

### ORDER

Pursuant to the memorandum filed herein this day,

IT IS HEREBY ORDERED that defendant's motion to dismiss plaintiff's complaint be and is granted.

IT IS FURTHER ORDERED that plaintiff's motion to enjoin defendant from proceeding in the United States District Court for the Southern District of Texas be and is denied.

IT IS FURTHER ORDERED that defendant's motion to transfer be and is denied as moot.

D.C.Mo.,1985.
Koch Engineering Co., Inc. v. Monsanto Co.
621 F.Supp. 1204

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT F**



815 F.Supp. 994

815 F.Supp. 994, 26 U.S.P.Q.2d 1863

**(Cite as: 815 F.Supp. 994)**

Page 1

**H**
**Texas Instruments** Inc. v. **Micron Semiconductor,** Inc.
E.D.Tex.,1993.

United States District Court, E.D. **Texas**, Marshall Division.
**TEXAS INSTRUMENTS** INC., Plaintiff,
v.
**MICRON SEMICONDUCTOR**, INC.; Nova Marketing, Inc.; Hyundai Electronics Industries Co., Ltd.; and Hyundai Electronics America, Inc., Defendants.
**No. 2:92-CV-0113.**

Feb. 25, 1993.

Holder of patents brought infringement suit after party to expired cross-licensing agreement filed suit in another jurisdiction for declaration that it was not infringing on holder's patents. Holder moved reconsideration of order transferring infringement action. The District Court, _Hall_, J., held that: (1) under first to file rule, first-filed court had responsibility to determine which case should proceed, and (2) infringement case should be stayed rather than transferred.

Motion denied and stay ordered.
West Headnotes
**[1] Federal Civil Procedure 170A** ☜2641

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(G) Relief from Judgment
            170Ak2641 k. In General. _Most Cited Cases_
District court has discretion to entertain motion to reconsider requesting court to relieve party from previous order. _Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A._

**[2] Federal Courts 170B** ☜1145

170B Federal Courts
    170BXIII Concurrent and Conflicting Jurisdiction and Comity as Between Federal Courts
        170Bk1145 k. Pendency and Scope of Prior Proceedings; Prisoners Under Arrest. _Most Cited Cases_

First-to-file rule is doctrine of federal comity which permits district court to decline jurisdiction over action when complaint involving same parties and issues has already been filed in another district.

**[3] Federal Courts 170B** ☜1145

170B Federal Courts
    170BXIII Concurrent and Conflicting Jurisdiction and Comity as Between Federal Courts
        170Bk1145 k. Pendency and Scope of Prior Proceedings; Prisoners Under Arrest. _Most Cited Cases_
In determining whether to apply first-to-file rule, which permits district court to decline jurisdiction, court must resolve whether two pending actions are so duplicative or involve substantially same issues that one court should decide subject matter of both actions and which of two courts should take case.

**[4] Federal Courts 170B** ☜1145

170B Federal Courts
    170BXIII Concurrent and Conflicting Jurisdiction and Comity as Between Federal Courts
        170Bk1145 k. Pendency and Scope of Prior Proceedings; Prisoners Under Arrest. _Most Cited Cases_
Two actions involving closely related questions, common subject matter, or core issues which substantially overlap satisfied duplicative requirement for first-to-file rule to apply and permit district court to decline jurisdiction; two cases need not be identical.

**[5] Federal Courts 170B** ☜1145

170B Federal Courts
    170BXIII Concurrent and Conflicting Jurisdiction and Comity as Between Federal Courts
        170Bk1145 k. Pendency and Scope of Prior Proceedings; Prisoners Under Arrest. _Most Cited Cases_
Under first-to-file rule, federal district court first seized of jurisdiction over dispute should be permitted to adjudicate that controversy fully.

**[6] Action 13** ☜69(5)

815 F.Supp. 994                                                              Page 2

815 F.Supp. 994, 26 U.S.P.Q.2d 1863

(Cite as: 815 F.Supp. 994)

13 Action
    13IV    Commencement, Prosecution, and
Termination
        13k67 Stay of Proceedings
            13k69 Another Action Pending
                13k69(5) k. Nature and Subject Matter of
Actions in General. Most Cited Cases
Under first-to-file rule, patent infringement
proceeding filed in second court would be stayed
pending resolution of motion to sever portion of
earlier filed action.


Patents 291 ⌘328(2)

291 Patents
    291XIII Decisions on the Validity, Construction,
and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited
Cases
4,748,349, 4,533,843. Cited.

Carl R. Roth,Law Offices of Carl R. Roth, Marshall,
TX, Robert W. Turner, Robert M. Mason, Hal D.
Cooper, Robert W. Weller, Jones, Day, Reavis &
Pogue, Jay C. Johnson, Texas Instruments, Inc.,
Dallas, TX, for plaintiff.
Jerry S. Harris, Stephen W. Howard, Harbour,
Kenley, Boyland, Smith & Harris, Longview, TX,
Wayne M. Harding, Michael McLemore, Clarence E.
Ericksen, W. Bryan Farney, Arnold, White &
Durkee, Houston, TX, for defendants.

### ORDER AND OPINION

HALL, District Judge.
CAME ON TO BE HEARD THIS DAY Plaintiff
**Texas Instruments'** Motion to Reconsider that
portion of the Court's Order of January 20, 1993
transferring **Texas Instruments'** cause of action
against the Defendant **Micron Semiconductor**, Inc.
to the United States District Court for the District of
Idaho. This Court, after reviewing the motion and the
response and reply thereto, finds that it is not well
taken, but that the Court's Order of January 20 should
be amended to reflect that the Plaintiff's action
against Defendant **Micron** is stayed, rather than
transferred.


### I. BACKGROUND

This case arises out of a dispute between Plaintiff
**Texas Instruments** Incorporated (" TI" ) and
Defendants **Micron Semiconductor**, Inc. (" Micron"

), Nova Marketing Inc. (" Nova" ), Hyundai
Electronics Industries Co., Ltd. (" Hyundai
Industries" ), and Hyundai Electronics America, Inc.
(" Hyundai" ), over licensing agreements for
DRAMs.FN1 The most recent crosslicensing
agreement between TI and **Micron** expired on
September 3, 1992, and the parties had not completed
negotiations concerning a new agreement at that
time. **Micron** won the ensuing race to *996 the
courthouse, filing suit in its chosen venue, the U.S.
District Court for the District of Idaho, on September
2, 1992. FN2 *Micron Semiconductor, Inc. v. Texas
Instruments, Inc.,* No. 92-0352S (D.Idaho). In that
suit, **Micron** sought a declaration that it was not
infringing on 39 of TI's patents.

> FN1. A DRAM (Dynamic Random Access
> Memory), pronounced " DeeRam," is a
> standard type of semiconductor chip used
> as memory in a wide variety of applications.

> FN2. As one commentator has observed, "
> [a]ll too often, patent infringement suits
> begin with a battle over where the war is to
> be fought." Wydick, *Venue in Actions for
> Patent Infringement,* 25 Stan.L.Rev. 551
> (1973).

TI responded by bringing two actions the next day,
September 3, 1992, in the Western District of Texas
in Austin, and the Northern District of Texas in
Dallas. The Austin action covered some of the
patents in the Idaho case and has since been
dismissed by TI. The Dallas action deals with several
of Micron's patents. TI filed this action against
Micron on September 25, 1992, including as
additional defendants Micron Technology, Inc.
(which has been dismissed with Plaintiff's consent),
Nova, Hyundai, and Hyundai Industries. In this suit,
TI alleges that the Defendants are infringing on
United States Letters Patent Nos. 4,533,843 and
4,748,349, which are two of the 39 patents from the
Idaho action.

Defendant Micron argued in its previous motion to
dismiss or transfer that the " first-to-file" rule
requires that this court dismiss this action or transfer
it to the District of Idaho, where a previously filed
suit involving the same two patents is currently
pending. On January 20, 1993, this Court ordered TI's
action against Nova stayed, and TI's action against
Micron transferred to the District of Idaho. TI now
asks the Court to reconsider that part of its Order

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transferring its claims against Micron.

## II. MOTION TO RECONSIDER

[1] Fed.R.Civ.P. 60(b) confers authority on the Court to reconsider its judgments, orders, or proceedings.[FN3] Of course, the Court's orders are not to be viewed as " mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Industries, Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988). However, an abundance of caution and concern for the rights of the parties counsels that the Court, either sua sponte, or upon motion of the parties, reexamine its orders and rulings as necessary to ensure their fidelity to the controlling law. Accordingly, the Court has discretion to entertain a motion requesting it, on such terms as are just, to relieve a party from a previous Order of the Court.

> FN3. Micron asserts that TI's Motion to Reconsider should be viewed as a Fed.R.Civ.P. 59(e) motion to alter or amend a judgment because it was filed within ten days of the order transferring the case. *See Lavespere v. Niagara Machine and Tool Works Inc.,* 910 F.2d 167 (5th Cir.1990). However, the Court's previous order transferring the case was not a " judgment," as the *Lavespere* court's summary *judgment* was. Hence the strict standard of Rule 59(e) requiring " manifest errors of law" or " newly discovered evidence" does not apply. *See, e.g., Waltman v. International Paper Co.,* 875 F.2d 468, 473-474 (5th Cir.1989).

## III. FORUM SHOPPING

In its response to TI's Motion to Reconsider, Micron argues that TI's conduct in prosecuting this and related actions constitutes " blatant forum shopping, which should not be condoned." Defendant's Response at 4. In reality, every litigant who files a lawsuit engages in forum shopping when he chooses a place to file suit. The Court is concerned only with whether the choice of forum is a proper one under the law, and not with the motives of the party selecting the forum. The venue statutes are intentionally broad, and litigants must often make an election from among several options as to where to file a lawsuit. The litigant's right to choose a forum is well established, and there are well-recognized tests under 28 U.S.C. § 1404 to determine whether a party has

exceeded the bounds of fairness, convenience, and judicial economy in the selection made. *See, e.g., Box v. Ameritrust Texas, N.A., et al.,* 810 F.Supp. 776 (E.D.Tex.1992).

## IV. DISCUSSION

The Court's Order of January 20, 1993 transferring TI's action against Micron placed substantial reliance on the " first-to-file" rule in deciding to defer to the prior-filed Idaho action. Plaintiff now asks the Court to reconsider that decision, arguing *997 that the Court should consider the totality of the circumstances in determining whether the first-filed case should defer to the second-filed one.

### A. " First-to-File" Rule

[2] Federal district courts are courts of coordinate jurisdiction and equal rank, and must exercise care to avoid interference with each other's affairs and duplicative litigation. The " first-to-file" rule is a generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district. *See, e.g., Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952).

[3][4][5] In determining whether to apply the first-to-file rule to an action, a court must resolve two questions: 1) are the two pending actions so duplicative or involve substantially similar issues that one court should decide the subject matter of both actions; and 2) which of the two courts should take the case? *Superior Savings Association v. Bank of Dallas,* 705 F.Supp. 326, 328-329 (N.D.Tex.1989). As to the first inquiry, all that need be present is that the two actions involve closely related questions or common subject matter, or that the core issues substantially overlap. The cases need not be identical to be duplicative. *Id.* at 329 (quoting *Mann Manufacturing, Inc. v. Hortex, Inc.,* 439 F.2d 403, 407 (5th Cir.1971); *see also West Gulf Maritime Association v. ILA Deep Sea Local 24,* 751 F.2d 721, 730 (5th Cir.1985). In this case, the issues of validity and infringement as to the '843 and '349 patents are also present in the Idaho case, which was filed 23 days before this suit. As to the second inquiry, the rule is that the court first seized of jurisdiction over a dispute should be permitted to adjudicate that controversy fully. *West Gulf Maritime,* 751 F.2d at

815 F.Supp. 994                                                                                            Page 4
815 F.Supp. 994, 26 U.S.P.Q.2d 1863
**(Cite as: 815 F.Supp. 994)**

729; *Mann Manufacturing,* 439 F.2d at 407.

However, the first-to-file rule is not a rigid or inflexible rule to be mechanically applied. As the Ninth Circuit stated in *Church of Scientology of California v. United States Department of the Army,* 611 F.2d 738, 750 (9th Cir.1979):

" [T]he " first to file " rule normally serves the purpose of promoting efficiency well and should not be disregarded lightly. Circumstances and modern judicial reality, however, may demand that we follow a different approach from time to time...."

(Citation omitted); *see also Pacesetter Systems, Inc. v. Medtronic, Inc.,* 678 F.2d 93, 95 (9th Cir.1982). The Fifth Circuit has followed the same principles of flexibility with regard to the first-to-file rule. *See, e.g., Mann Manufacturing,* 439 F.2d at 407 (" In the absence of compelling circumstances the court initially seized of the controversy should be the one to decide whether it will try the case" ); *West Gulf Maritime,* 751 F.2d at 729. Likewise, the Supreme Court has emphasized that the decision of whether to apply the first-to-file rule is discretionary, and involves determinations concerning " [w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Kerotest,* 342 U.S. at 183, 72 S.Ct. at 221.

B. Declaratory Judgment Actions and Actions for Infringement

TI argues that actions for infringement traditionally take precedence over declaratory judgment actions, even where later-filed, based on the general policy that a party whose rights are being infringed should have the privilege of electing where to enforce its rights.[FN4]  Numerous cases support this conclusion.*998 *See, e.g., Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.,* 267 F.Supp. 938 (S.D.N.Y.1967); *909 Corp. v. Village of Bolingbrook Police Pension Fund,* 741 F.Supp. 1290 (S.D.Tex.1990). In *Sweetheart,* a prior-filed declaratory judgment action in New York was transferred to the patent infringement action filed in Chicago because the New York court determined that the convenience inherent in the later-filed court outweighed the priority of filing.[FN5] In *909 Corp.,* the district court articulated persuasive reasons for departing from the first-to-file rule in declaratory judgment versus infringement cases.

FN4. **Micron** asserts that the Idaho action is more than a declaratory judgment action, since TI has asserted claims for infringement as to each of the patents, and **Micron** has also added an infringement action against TI as to one of **Micron's** patents. This argument is not persuasive for three reasons. First, because a claim for infringement is a compulsory counterclaim to a declaratory judgement action, and therefore *must* be brought, or is waived. Second, **Micron** is only asserting that TI has infringed *one* of **Micron's** patents. Finally, TI is not seeking a wholesale transfer or dismissal of the Idaho action, only the severance and transfer of its claims regarding these two patents. TI has admitted that it is satisfied to allow the remainder of the Idaho case to proceed if it can have these two patents tried in the forum of its choosing. Plaintiff's Reply Brief at 9.

FN5. Notable among that court's factors for deciding to transfer the case was the court's determination that the docket condition in Chicago would afford a speedy disposition. See section IV. C., *infra.*

Courts have held that a declaratory claim should be dismissed if it was filed for the purpose of anticipating a trial on the same issues in a court of coordinate jurisdiction. (Citations omitted). The Court cannot allow a party to secure a more favorable forum by filing an action for a declaratory judgment when it has notice that another party intends to file suit involving the same issues in a different forum. *Id.* at 1292.

The reason that many courts have disallowed use of a declaratory judgment action to establish venue is found in the underlying purposes of the Declaratory Judgment Act (the " Act" ), codified at 28 U.S.C. § 2201. The Act was intended to provide a remedy which would " minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication without waiting until his adversary should see fit to begin an action after the damage has accrued." 10A C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure* § 2751 at 569 (1983). In *Koch Engineering Company, Inc. v. Monsanto Company,* 621 F.Supp. 1204, 1206 (D.C.Mo.1985), the court rejected the first-to-file rule, holding that the plaintiff's suit was no more than a race to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

815 F.Supp. 994                                                      Page 5

815 F.Supp. 994, 26 U.S.P.Q.2d 1863

**(Cite as: 815 F.Supp. 994)**

courthouse, and that it furthered none of the purposes of a declaratory judgment action. Rather, it denied the injured party the right to choose the forum in which to seek redress. *Id.* at 1207; *see also Cunningham Brothers, Inc. v. Bail,* 407 F.2d 1165, 1167 (7th Cir.1969), *cert. denied,* 395 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745 (1969). *Koch* concluded that the interests of comity and judicial economy would best be served by dismissing the prior suit for declaratory judgment. *Id.* at 1208.

In another declaratory judgment case, *Tempco Electric Heater Corporation v. Omega Engineering, Inc.,* 819 F.2d 746 (7th Cir.1987), the court also deferred to the later-filed infringement action, stating that:
[T]he mere fact that Tempco filed its declaratory judgment action first does not give it a " right" to choose a forum ... As we have noted before, " The wholesome purpose of declaratory acts would be aborted by its use as an instrument of procedural fencing either to secure delay or choose a forum." (Citation omitted). " [T]he federal declaratory judgment is not a prize to the winner of the race to the courthouse." (Citation omitted).

*See also, American Greiner Electronic, Inc. v. Establissments Henry-LE Paute, S.A.,* 174 F.Supp. 918 (D.D.C.1959); *Technical Tape Corp. v. Minnesota Mining and Mfg. Co.,* 135 F.Supp. 505 (S.D.N.Y.1955). The *Tempco* court went on to state that while a first-to-file rule would have the virtue of certainty, " the cost-a rule which will encourage an unseemly race to the courthouse and quite likely numerous unnecessary suits-is simply too high." *Id.*

C. Which Court Should Proceed?

Based on the above, TI argues that the dispute concerning these two patents should be resolved in this Court. TI notes several factors in support of this argument, none of which are controverted by the Micron.

First, TI asserts that the litigation of this case may be substantially shortened because one of these patents, U.S. Patent No. 4,533,843 has been litigated previously in a proceeding before the United States Patent International*999 Trade Commission in 1986. *See In re: Certain Dynamic Random Access Memories, Inv. # 337-242* (USITC 1986). The other patent included in this suit, U.S. Patent Number 4,748,349 is closely related to the '843 patent, which

will further simplify evidentiary presentation. This factor alone is a compelling argument for severing these two patents from the other patents in the Idaho suit, none of which, to the Court's knowledge, have been previously litigated.

Second, TI claims that one reason that it has chosen to litigate these two patents in this Court to take advantage of the Civil Justice Expense and Delay Reduction Plan adopted in this District, and this Court's historically current docket.[FN6] This Court has previously held, in a published opinion, that the adoption of the Plan, as well as the condition of this Court's docket, are significant factors to consider in determining whether a case should be transferred under 28 U.S.C. § 1404(a). *See Box v. Ameritrust Texas, N.A., et al.,* 810 F.Supp. 776 (E.D.Tex.1992).

> FN6. A management conference in this case was held on February 1, 1993, and this case is now set for jury selection on November 30, 1993. In contrast, the judge to whom the Idaho case was assigned seems to be less hopeful of an early trial setting. In a recent hearing, he stated that: " [b]y the time you get to trial you will have a new judge. This one will be long gone." Transcript of Hearing, October 30, 1992, Civ. No. 92-0352 5 MJC, D. Idaho, at page 27.

Third, there will be no savings of judicial resources if the Idaho case proceeds with these two patents, since this Court will proceed with TI's claims against Hyundai *on these same two patents* in any case. On the contrary, proceeding with this case will conserve judicial resources by providing the parties with the opportunity to determine the rights of TI, Micron, and Hyundai with respect to these two patents using the streamlined and efficient discovery procedures under the Plan, and in the process aid the Idaho court in moving its case to a prompt resolution.

Finally, TI argues persuasively that it will be deprived of a speedy and efficient resolution of its intellectual property disputes with the Defendants if it is forced to litigate all 39 patents in the Idaho action simultaneously. In addition, TI complains that the practical effect of allowing the Idaho action to proceed is to permit Micron to utilize TI's intellectual property embodied in the '843 and '349 patents indefinitely, without compensation.

[6] Despite the above, however, the Court cannot

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

815 F.Supp. 994                                                                                                    Page 6
815 F.Supp. 994, 26 U.S.P.Q.2d 1863
**(Cite as: 815 F.Supp. 994)**

grant the relief TI requests for the reason that the first-to-file rule gives the *first-filed* court the responsibility to determine which case should proceed. *See, e.g., Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93, 96 (9th Cir.1982).* Apprehension that the first-filed court will fail to appropriately consider the convenience of the parties and the witnesses is not a proper matter for the Court's consideration. *See Kerotest, 342 U.S. at 185, 72 S.Ct. at 222 (quoting Graham v. United States, 231 U.S. 474, 480, 34 S.Ct. 148, 151, 58 L.Ed. 319 (1913)).* This Court simply may not, consistent with the principles of comity and conservation of judicial resources, usurp the first-filed court's role.

Plaintiff appears to argue that a second-filed court should be allowed to exercise its discretion to proceed with a case so long as it does not interfere with the first-filed court's jurisdiction, as was the case in *Mann Manufacturing* and *West Gulf Maritime.* The Court does not choose to create such an exception to the first-to-file rule. Rather, the Court finds that the principles of comity that underlie the rule require that this Court defer to the Idaho court the decision as to which case should proceed. The Court has been informed that TI has now filed a motion in the Idaho case requesting that that court sever, stay, or transfer to Texas the portion of the Idaho declaratory judgment action that relates to the patents TI elected to enforce in this Court. That motion, not Plaintiff's Motion to Reconsider, is the proper vehicle to resolve the issue of which court should proceed with these two patents.

Upon further consideration, however, the Court does find that TI's causes of action against Micron should be stayed rather than transferred, as this Court should retain jurisdiction over them until such time as it may appropriately proceed. *See, e.g., \*1000Alltrade, Inc. v. Uniweld Products, Inc., 946 F.2d 622, 629 (9th Cir.1991) (citing West Gulf Maritime, 751 F.2d at 729, n. 1.*

## V. CONCLUSION

As discussed above, the Court finds merit with Plaintiff's assertions that its claims against Micron should proceed in this Court along with its claims against Defendant Hyundai. Such a decision would result in the case being litigated in the forum chosen by the aggrieved patent owner, and in the case being resolved more quickly and with much less cost to the parties. Further, allowing the parties to proceed to

trial in this Court is consistent with the policies underlying the first-to-file rule, and prevents potential misuse of the Declaratory Judgment Act.

However, as stated above, the court that must make the above determination of which case should proceed sits not in Marshall, but in Boise. Any other conclusion would undermine the considerations of comity that courts of concurrent jurisdiction must observe.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff's Motion to Reconsider is hereby in all things DENIED.

IT IS FURTHER ORDERED that the portion of the Court's Order of January 20, 1993 transferring Plaintiff's action against Defendant **Micron** Semiconductor, Inc. to the United States District Court for the District of Idaho for further proceedings is hereby VACATED.

IT IS FURTHER ORDERED that Plaintiff's action against Defendant **Micron** is hereby STAYED pending further order by this Court.

E.D.Tex.,1993.
Texas Instruments Inc. v. Micron Semiconductor, Inc.
815 F.Supp. 994, 26 U.S.P.Q.2d 1863

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT G**



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 180252 (N.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**C**

Utica Mut. Ins. Co. v. **Computer Sciences Corp.**
N.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
**UTICA MUTUAL INSURANCE** COMPANY,
Plaintiff,
v.
**COMPUTER SCIENCES** CORPORATION,
Defendant.
**No. 5:03-CV-0400.**

Jan. 23, 2004.

Felt Evans, LLP, Clinton, New York, for Plaintiff, Kenneth L. Bobrow, of counsel.
Shaw Pittman LLP, McLean, VA, for Plaintiff, Walter J. Andrews, Robert R. Lawrence, Leslie Brown, of counsel.
Piper Rudnick LLP, New York, New York, for Defendant, Loren H. Brown, Christopher G. Campbell, of counsel.
Piper Rudnick LLP, Baltimore, MD, for Defendant, Cheryl Zak Ladieri, Arthur F. Fergenson, of counsel.

*MEMORANDUM-DECISION and ORDER*
HURD, J.

## I. *INTRODUCTION*

**\*1** Plaintiff **Utica Mutual Insurance** Company (" **Utica Mutual**" ) brings this action against **Computer Sciences** Corporation (" **CSC**" ) for breach of contract and breach of express warranties regarding CSC's software tool purchased by **Utica Mutual** that was designed to summarize injury claims and recommend a settlement range. On March 4, 2003, **Utica Mutual** filed the instant action in Oneida County Supreme Court. Defendant removed the action to federal court. CSC moves to dismiss the complaint filed by **Utica Mutual** or, in the alternative, to stay this case pending resolution of a similar lawsuit filed by CSC in the United States District Court for the Western District of Texas. Plaintiff cross moves to stay the Texas action.

Oral argument was heard on this matter on August 22, 2003, in Albany, New York. Decision was reserved.

## II. *FACTS*

Utica Mutual is a property and casualty insurance company that provides automobile and homeowner's insurance, and processes claims made under those policies. It is a New York corporation with its principal place of business in New Hartford, New York.

Defendant CSC is a Nevada corporation with its principal place of business in El Segundo, California. CSC provides information technology solutions, including " Colossus," a software program which aids insurance companies in the evaluation of trauma-induced injuries. The Colossus system provides a connection between insurance coverage and medical information by evaluating " the level of pain and suffering for a given injury, the effect of the injury in impairing the body, and the impact on the claimant's lifestyle" and recommending a settlement range. (Pl. Compl. at 2.) According to CSC's marketing claims, use of the Colossus summaries and recommendations will result in greater consistency in determining payment or settlement of trauma-induced bodily injury claims by the **insurance** company.

CSC conducted a study to determine the potential benefits of the software regarding **Utica Mutual's** closed claims. The CSC study, as presented in a Consistency and Impact Analysis statement, concluded that **Utica Mutual** " would save 16.16% on settlement costs by using Colossus on their closed claims, which would amount to a total savings of $36 million over five years." *Id.* at 3. Additionally, the CSC study projected that **Utica Mutual** would incur costs for the use of Colossus in the amount of $700,000. *Id.* at 3.

On November 24, 1998, **Utica Mutual** executed the CSC Customer agreement (" agreement" ) whereby CSC granted to it a license to use Colossus for five years with a right to extend the agreement for an additional five years. Pursuant to the agreement, **Utica Mutual** paid CSC a $1.8 million licensing fee for Colossus in addition to monthly utilization and support fees for five years totaling $3.5 million. (Pl. Opp'n to Def. Mot. to Dismiss Ex. 2 ¶ 8.) On February 29, 2000, Utica Mutual exercised the option to extend the agreement for an additional five years.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 180252 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Utica Mutual maintains that since entering into the agreement, it has paid CSC a total of approximately $4.7 million, which it now seeks to recover. CSC asserts that the specific amounts owed to Utica Mutual by CSC constitute confidential information and cannot be publicly disclosed. (Def. Mot. to Dismiss Ex. B ¶ 8.)

**\*2** In early 2000, Utica Mutual alleges they began to have serious problems with Colossus, as Utica Mutual's claims adjusters were settling half of their claims below the suggested " low" settlement. *Id.* at 4. It addition it claims Colossus required an excessive amount of time for claims handlers to input claims and injury data into the system, which hindered claims adjusters' ability to properly evaluate claims.

In September 2001, Utica Mutual met with CSC to discuss these problems with Colossus, as well as the system's failure to yield the cost savings that CSC had represented before the purchase. Utica Mutual claims CSC attempted to address the problems with Colossus but failed to make any changes. In March 2002, Utica Mutual advised CSC that it would discontinue its use of Colossus and also discontinue its monthly payments to CSC for the Colossus software. Monthly fees due under the agreement from Utica Mutual to CSC stopped as of May 2002.

On February 20, 2003, CSC sent Utica Mutual a letter demanding Utica Mutual's prompt payment of all unpaid fees, and upon a failure to do so, CSC threatened to pursue legal action.[FN1] On that same date, CSC sent another letter that constituted a formal offer to settle the dispute. The offer was to remain open until March 14, 2003. **Utica Mutual** did not respond to these letters. As noted above, this action was filed on March 4, 2003.

> FN1. CSC's February 20, 2003 demand letter addressed to Richard Creedon, senior vice president of claims for **Utica Mutual**, reads: " This letter constitutes notice of material breach pursuant to Section 11 of the General Terms and Conditions portion of the CSC Customer Agreement, dated November 30, 1998 (the " Agreement" ), by and between **Computer Sciences** Corporation (" CSC" ) and **Utica Mutual Insurance** Company (" **Utica**" ). Specifically, **Utica** has materially breached the Agreement by failing to pay the invoices listed on Attachment A, along with any accrued

interest, CSC will have no choice but to pursue all available options, including, but not limited to, a possible legal action against Utica to recover such amounts, plus interest, attorneys fees, and costs."

In its *first* cause of action, Utica Mutual claims CSC breached the agreement by failing to deliver a software product that " reduced Utica's bodily injury settlement payments, improved Utica's claims-handling efficiency and consistency, performed adequately in Utica's business environment, or achieved the cost-savings that CSC had promised to Utica." *Id.* at 5. In its *second* cause of action, Utica Mutual claims CSC breached express warranties made in the agreement, namely the warranties that the purpose of Colossus was to reduce settlements and provide consistency in Utica Mutual's claims process, and that Utica Mutual would achieve cost-savings in the amount of $35 million over five years. In its *third* cause of action, Utica Mutual claims CSC breached its implied warranties of merchantability and fitness by failing to comply with the promises made regarding the results of the Colossus software. In its *fourth* cause of action, Utica Mutual claims CSC negligently misrepresented that the Colossus system would meet the stated goals and save the company the amount of money specified, before Utica Mutual entered into the agreement with CSC.

Utica Mutual requests a declaration that the agreement between the parties is void, and seeks damages and reimbursement of the amounts it paid to CSC under the agreement.

On May 6, 2003, CSC filed suit in the Western District of Texas, claiming Utica Mutual breached the agreement by failing to make the mandated monthly payments for its use of the Colossus system, from May 2002 forward. CSC further alleges in its complaint that the agreement provided that the laws of Texas would govern the agreement and contained a disclaimer of warranties including a disclaimer of implied warranties of merchantability and fitness.

### III. *DISCUSSION*

#### A. *First-Filed Rule*

**\*3** CSC first argues that the complaint should be dismissed because it is an anticipatory lawsuit filed in direct response to CSC's February 20, 2003 letter demanding payment. Utica Mutual counters by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claiming CSC's motion to dismiss, coupled with its filing of the Texas action, is an improper effort to deprive Utica Mutual of its choice of forum by engaging in forum shopping. In deciding which of the two actions should proceed, discussion of the first-filed rule is necessary. According to the first-filed rule, the first-filed action is given priority if does not constitute an improper anticipatory filing of a similar lawsuit:

Where there are two competing lawsuits, the first-filed should have priority, absent the showing of balance of convenience ... or ... special circumstances ... giving priority to the second. Special circumstances justifying an exception to the rule exist where the first suit constitutes an improper anticipatory filing or was motivated solely by forum shopping. An improper anticipatory filing is one made under the apparent threat of a presumed adversary filing the mirror image of that suit in another court.

*Reliance Ins. Co. v. Six Star, Inc.*, 155 F.Supp.2d 49, 54 (S .D.N.Y.2001).

### B. *Anticipatory Filing*

In *Reliance Insurance Company*, the defendants argued that the plaintiffs engaged in an improper anticipatory filing and in support of their argument, the defendants offered a chronology of communications exchanged between the parties prior to the commencement of the suit. *Id.* at 55. The court found that there was no suggestion in the chronology of communication between the parties that the plaintiff filed the suit in response to a direct threat of litigation because there was no indication by the defendant of " a firm intention to commence an action and that [p]laintiff raced to the Court in anticipation of such filing by [d]efendants." *Id.* at 55. Furthermore, the parties had continuous conversation regarding the defendant's claim for five months before plaintiffs commenced a declaratory judgment action. *Id.* The court held that plaintiff's commencement of a declaratory judgment action to resolve the controversy over the defendant's claim did not constitute an improper anticipatory filing. *Id.*

The direct opposite is clear in this case. The chronology of communication here indicates that Utica Mutual did indeed file suit in response to a direct threat of litigation. On February 20, 2003, CSC sent to Utica Mutual two letters, the first of which threatened possible litigation, and the second of

which offered a settlement. The letter from CSC threatening litigation stated, " [i]f Utica does not promptly pay the invoices listed ... CSC will have no choice but to pursue all available options including, but not limited to, a possible legal action against Utica to recover such amounts...." (Def. Mot. to Dismiss Ex. C.)

In *Reliance Ins. Co.,* the plaintiff's filing of a declaratory judgment action was the natural progression of events after the attempts to resolve the matter through correspondence proved unsuccessful. In the instant action, however, these letters were the only written correspondence between the parties prior to the commencement of Utica Mutual's action against CSC. On March 4, 2003, less than two weeks after CSC's demand letter, Utica Mutual commenced the instant action in New York state court. CSC's letter is a clear indication that it had a firm intention to commence an action against Utica Mutual if it did not pay. As Utica Mutual filed their action against CSC less than two weeks after receiving the letter, without engaging in any further correspondence, it raced to the courthouse first, in anticipation of CSC's threatened lawsuit.

*4 Utica Mutual maintains that it and CSC spent over a year trying to resolve the matter outside of litigation and that while Utica Mutual stopped making payments to CSC in May 2002, CSC did not demand payment until February 20, 2003 and at no time did CSC directly threaten Utica Mutual with litigation. (Pl. Opp'n to Def. Mot. to Dismiss at 6-7.) Utica Mutual further argues that the February 20, 2003 letter proposing a settlement indicated CSC's interest in continuing to discuss a settlement, not pursue litigation. *Id.* at 7. It is not readily believable that CSC's letter indicated a mere interest in further discussing settling the suit but is instead an ultimatum to either settle the dispute pursuant to CSC's terms or face litigation. (Def. Mot. to Dismiss Ex. D.) The first sentence of the letter reads, " this letter constitutes a formal offer to settle the dispute ..." and proceeds to enumerate nine terms by which CSC would be willing to settle the dispute. *Id.* The letter closes by imposing an acceptance deadline of March 14, 2003, on Utica Mutual and if Utica Mutual fails to meet the deadline, CSC's settlement offer is considered withdrawn. *Id.*

CSC's letter does not suggest an interest in negotiation, it makes an offer and requires Utica Mutual's acceptance by March 14, 2003. CSC's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 180252 (N.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

formal settlement letter taken in consideration with its same date letter demanding payment and threatening legal action clearly notify Utica Mutual of the impending litigation. CSC's letters, therefore, cannot be read as indicating an interest in further settlement discussions.

Utica Mutual argues that CSC's letters indicate only the *possibility* of litigation rather than a direct threat and a mere *interest* in further settlement discussions. If so, why did Utica Mutual not pursue settlement negotiations by discussing the settlement terms provided by CSC or by making a counter offer? Instead, Utica Mutual's only response was to commence legal action on March 4, 2003, ten days before the settlement offer was due to expire. Furthermore, although the parties may have been trying to resolve the matter for over a year, Utica Mutual offers no proof that it filed its action as a result of a breakdown in communications, but rather in response to a direct threat of litigation.

Utica Mutual's argument that CSC's letters were not a direct threat of litigation and proposed negotiating a settlement is thwarted by the fact that the letters were clear in their intent to procure a settlement or pursue a legal course of action. It is also thwarted by the fact that Utica Mutual made no effort to engage in the supposed settlement discussions but instead filed a complaint before the settlement deadline. Therefore, Utica Mutual's first-filed action is an improper anticipatory filing.[FN2]

> FN2. It would be logical for Utica Mutual to anticipate that CSC's action would be filed in Texas (choice of law), Nevada (incorporation) or California (principle place of business). In any event, the filing would be a considerable distance from Utica Mutual's home base of New York.

### C. Remedy

Courts have demonstrated a willingness to favor the second-filed action in cases analogous to the instant action where the first-filed action was filed in anticipation of litigation. Deviation from the first-filed rule is warranted where " a party files suit seeking a declaratory judgment immediately after receiving notice of a planned suit from the other party thus winning a ' race to the courthouse.' *Cooperative Centrale Raiffeisen-Boerenleen Bank B.A. v. Northwestern National Insurance Company of*

*Milwaukee, Wisconsin,* 778 F. Supp 1274, 1278 (S.D.N.Y.1991). In *Cooperative Centrale,* the plaintiff sent to the defendant a notice letter dated January 20, 1991 demanding payment of a debt. *Id.* The letter did not threaten imminent litigation but it did notify the defendant of the outstanding debt and demanded payment. *Id.* On March 6, 1991, the defendant filed suit seeking a declaratory judgment. *Id.* The court held that because the defendant filed its declaratory judgment action shortly after receiving the demand letter, knowing it did not intend to pay the debt demanded, and anticipating that the plaintiff would sue, a departure from the first-filed rule was warranted. *Id.* at 1279.

\*5 The instant case is similar in that Utica Mutual's action was filed after receipt of a demand letter regarding its debt. The instant case, however, evinces even greater cause to depart from the first-filed rule as CSC's letter specifically mentioned the possibility of legal action as an alternative in resolving the matter. Furthermore, Utica Mutual responded even more quickly than the defendant in *Cooperative Centrale* by racing to the courthouse less than two weeks after receiving the demand and settlement letters. Departure from the first-filed rule is warranted.

The proper remedy in a case of an improper anticipatory filing is either a stay of the one action pending the outcome of the similar action brought in another forum, or a dismissal of the first-filed action altogether in favor of the second-filed action. *See Regions Bank v. Wiedar & Mastroianni, P.C.,* 170 F.Supp.2d 436, 439 (S.D.N.Y.2001). The purpose of the rule is to " avoid duplication of judicial effort ... [and] achieve comprehensive disposition of litigation among parties over related issues ... [u]ltimately the decision of whether or not to stay or dismiss a proceeding rests within a district judge's discretion." *Id.*

The specific remedy of dismissing the first-filed action in favor of the latter action has been granted where a declaratory judgment action has been filed preemptively. *Hanson PLC v. Metro-Goldwyn-Mayer Inc.,* 932 F.Supp. 104, 107 (S.D.N.Y.1996). In *Hanson,* the plaintiffs filed their declaratory judgment action just three days after Metro-Goldwyn-Mayer (" MGM" ) sent a cease and desist letter demanding that Hanson cease and desist using their James Bond character in a commercial. *Id.* at 105. Regarding a suit that is filed in response to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 180252 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

demand letter, the court reasoned:
[W]here the first-filed case is a declaratory judgment action precipitated by a demand letter and filed in anticipation of the later action, the second-filed action will be permitted to go forward in plaintiff's chosen forum.

*Id.* at 107 (quoting *Mass v. McClenahan*, No. 93 Civ. 3290(JSM), 1993 WL 267418, at *2 (S.D.N.Y. July 9, 1993).

Applying this reasoning, the court held that Hanson filed its lawsuit first only in response to MGM's cease and desist letter and dismissed the first-filed New York action in favor of the second-filed California action. *Id.* at 108.

Utica Mutual's first-filed action in New York state court was a similar preemptive strike against CSC in response to a demand letter in anticipation that CSC would take subsequent legal action in Texas, Nevada, or California. CSC's second-filed action should be allowed to proceed and Utica Mutual's first-filed action must be dismissed.

### D. *Choice of Law*

It is worth noting that the agreement does contain a choice of law provision whereby Texas law would govern a determination of the contractual rights between the parties. (Def. Mot. to Dismiss Ex. A at ¶ 12). The second-filed action is pending in the District Court for the Western District of Texas. If this action were allowed to proceed in the Northern District of New York, Texas law would have to be applied. This may result in duplication of judicial effort. It may also result in additional judicial time and effort as the court in Texas would be more familiar with Texas law. It is therefore within the sound discretion and in the interests of judicial economy to dismiss Utica Mutual's complaint in favor of the Texas action.

### IV. *CONCLUSION*

*6 Utica Mutual improperly filed the instant lawsuit in anticipation of CSC filing a mirror image lawsuit in another forum. An exception to the general rule that the first-filed action is given priority is justified, thereby dismissing plaintiff's complaint and allowing the second-filed action to proceed in the United States District Court for the Western District of Texas.

Accordingly, it is

ORDERED that

1. Defendant **Computer Sciences** Corporation's motion to dismiss is GRANTED, and the complaint is DISMISSED in its entirety; and

2. Plaintiff **Utica Mutual Insurance** Company's cross motion to stay the action pending in the Western District of Texas is DENIED.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

N.D.N.Y.,2004.
Utica Mut. Ins. Co. v. Computer Sciences Corp.
Not Reported in F.Supp.2d, 2004 WL 180252 (N.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.